[No. 55182–1.   En Banc.   June 29, 1989.]

CERTIFICATION FROM THE
UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WASHINGTON
IN
WASHINGTON WATER POWER COMPANY, *Plaintiff*, v.
GRAYBAR ELECTRIC COMPANY, ET AL,
*Defendants.*

*Paine, Hamblen, Coffin, Brooke & Miller,* by *Richard D. McWilliams, Richard W. Kuhling, Diane M. Hermanson,* and *J. Christopher Lynch,* for plaintiff.

*Bogle & Gates, Ronald E. McKinstry, Erik R. Lied,* and *Christopher N. Weiss,* for defendants.

*Bryan P. Harnetiaux* and *Robert H. Whaley* on behalf of Washington State Trial Lawyers Association, amici curiae for plaintiff.

*Margaret A. Morgan* on behalf of Washington Defense Trial Lawyers Association, amicus curiae for defendants.

[As amended by order of the Supreme Court September 27, 1989.]

DURHAM, J.— Washington Water Power Company (WWP) commenced this action in federal district court to recover damages incident to the failure of, and expected failure of, approximately 162,000 electric deadend insulators in use in WWP's electrical distribution system. Defendants are A.B. Chance Company (Chance), which manufactured the insulators between 1962 and 1984, and Graybar Electric Company (Graybar), the distributor from whom WWP purchased Chance insulators between 1973 and 1984. Construed in a light most favorable to WWP, the facts underlying the dispute are as follows.

The insulators are in place throughout WWP's service area in eastern Washington and northern Idaho. They sit

between live electric lines and the utility poles over which the lines are suspended, isolating the flow of electricity from the utility pole. Their expected useful life is considered to be about 50 years.

Since 1976, approximately 3,000 Chance insulators in use in WWP's distribution system have experienced performance failures, creating several types of hazards. In some instances, live lines have fallen to the ground. In others, electricity has leaked from the insulators to the surrounding equipment, causing pole and crossarm fires. Insulator performance failure also has caused radio and television interference in WWP's distribution area.

Between 1977 and 1983, WWP returned damaged insulators to Chance for testing. Chance in each instance advised WWP that the failures were caused by something other than the insulators themselves. In 1985, however, Chance advised that insulators manufactured after 1970 were defective. Following Chance's testings, WWP obtained a recommendation from the British Columbia Hydro & Power Authority that the insulators presented a safety hazard and should be removed from service.

WWP estimates that its damages from incidents of insulator failure through October 1987 include at least $2 million of damage to WWP property, $2,500 of damage to the property of third parties, and $100 in damages for personal injuries. WWP estimates as well that it will cost around $9 million to replace insulators that have not yet failed, including those manufactured before 1970.[1]

WWP's complaint states claims against Graybar for breach of contract and warranty, against Chance for violation of the federal racketeer influenced and corrupt organizations act (RICO), 18 U.S.C. § 1964, and the Washington product liability act (WPLA), RCW 7.72, and against both Graybar and Chance for negligence, strict liability, fraud, negligent misrepresentation, estoppel, and violation of

---

[1] Replacement of only the post–1970 insulators that British Columbia Hydro & Power Authority deemed unsafe would cost about $5 million.

the Washington Consumer Protection Act, RCW 19.86. Defendants moved for partial summary judgment on WWP's tort claims, contending that the costs of WWP's insulator replacement program constitute economic loss recoverable "only under the Uniform Commercial Code because the Washington Product Liability Act excludes economic loss from its remedial scheme and preempts common law tort remedies". As the result of a certification from the federal district court, we must determine what merit there may be to this contention.[2]

## I

The Washington product liability act (WPLA) is one piece of a broad legislative effort during the past decade directed at reforming various aspects of the law of torts. Like other tort reform statutes, the WPLA is designed to address a liability insurance crisis which could threaten the availability of socially beneficial products and services. *See* RCW 7.72.010 Preamble; *see also* Laws of 1986, ch. 305, § 100.

The centerpiece of the WPLA is the "product liability claim". The statute broadly defines this concept to include any product–related claim "previously based on . . . any other substantive legal theory except fraud, intentionally caused harm or a claim or action under the consumer protection act, chapter 19.86 RCW." RCW 7.72.010(4). The substantive liabilities of product manufacturers and sellers toward individuals or entities asserting product liability claims are specifically delineated in the statute. Manufacturers are liable for negligence in product design or in the

---

[2]The parties have notified us that they have reached a settlement. Nevertheless, in light of the important and likely recurrent nature of the issues presented, and considering the genuine adverseness of the parties and the exceptional quality of the briefing, we believe publication of the decision we reached before being apprised of the settlement is appropriate. *See Hart v. Department of Social & Health Servs.,* 111 Wn.2d 445, 448, 759 P.2d 1206 (1988); *Mall, Inc. v. Seattle,* 108 Wn.2d 369, 386, 739 P.2d 668 (1987); *Purchase v. Meyer,* 108 Wn.2d 220, 229–30, 737 P.2d 661 (1987); *Sorenson v. Bellingham,* 80 Wn.2d 547, 558, 496 P.2d 512 (1972).

provision of warnings concerning potential product hazards. RCW 7.72.030(1). Manufacturers also are strictly liable for unsafe product conditions resulting from construction defects and breaches of warranties. RCW 7.72.030(2). Product sellers not involved in a product's manufacture have the same liabilities as manufacturers in certain circumstances, and additionally bear liability for negligence, breach of express warranty and misrepresentation. RCW 7.72.040. A product liability claim may be maintained against a manufacturer or other product seller notwithstanding an absence of contractual privity. RCW 7.72-.010(5).

In addition to delimiting the substantive liabilities of manufacturers and product sellers, the WPLA describes the damages that persons or entities asserting product liability claims may recover. Such damages include "any damages recognized by the courts of this state", but not "direct or consequential economic loss under Title 62A RCW." RCW 7.72.010(6). Damages for direct or consequential economic loss are not prohibited to product liability claimants, but are simply made unavailable within the scheme of the WPLA. *See* RCW 7.72.020(2) ("Nothing in this chapter shall prevent the recovery of direct or consequential economic loss under Title 62A RCW.").

Two aspects of the WPLA are at issue in this case. First is the extent to which the WPLA preempts traditional common law remedies for product–related harms. Also at issue is the question of what sorts of damages the WPLA permits product users to recover from manufacturers and other product sellers with whom they have no contractual privity.

## II

The reasons why product liability plaintiffs such as WWP would wish to bring their claims under common law theories, rather than under the WPLA, are readily apparent. As discussed more fully below, the WPLA restricts recovery for "economic loss" to the law of sales. Thus,

under the WPLA, several significant obstacles to recovery may arise. One of these is the rule of privity. *See Baughn v. Honda Motor Co.,* 107 Wn.2d 127, 152, 727 P.2d 655 (1986). WWP is especially concerned to avoid this rule because, having purchased no insulators directly from Chance, it will be unable to recover damages from Chance if the sales law privity rule applies.[3] Under Washington common law, however, lack of privity would not bar WWP's recovery from Chance. *See Berg v. General Motors Corp.,* 87 Wn.2d 584, 555 P.2d 818 (1976) (economic loss held recoverable in tort from manufacturer with whom plaintiff was not in privity).

A second obstacle facing product liability plaintiffs is the set of contract sales rules relating to limitations of damages and disclaimers of warranties. *See* RCW 62A.2–316, 62A.2–718, 62A.2–719. Such limitations and disclaimers have no effect on a plaintiff's recovery under common law strict liability theory, but may pose a complete bar to recovery in a contract action. Because of the presence of liability limitation and warranty disclaimer clauses in the sales documents executed by WWP and Graybar, therefore, WWP understandably would prefer to avoid the sales law rules.

Also problematic for many product liability claimants is the sales law rule of repose. *See* RCW 62A.2–725. The 4–year sales law limitation period commences when the contract breach occurs (usually when tender of delivery is made), "regardless of the aggrieved party's lack of knowledge of the breach." RCW 62A.2–725(2). In a common law tort action, by contrast, the limitation period does not commence until the defect is discovered, or by reasonable diligence should have been discovered. *Sahlie v. Johns–Manville Sales Corp.,* 99 Wn.2d 550, 663 P.2d 473 (1983).

---

[3]Indeed, WWP argues that, if we hold that sales law governs its claims, we should abolish contract privity requirements. While we are aware that other courts have taken steps in this direction, *see, e.g., Spring Motors Distribs., Inc. v. Ford Motor Co.,* 98 N.J. 555, 489 A.2d 660 (1985), we decline to consider the matter, as it falls outside the scope of the federal district court's order of certification. *See* RCW 2.60.010(6), 2.60.020 (Supreme Court opinion should answer "the local law question submitted" by the federal court).

Thus, with respect to those insulators WWP received 4 years or more before it filed its complaint, the common law might afford a remedy that under the law of sales would be barred as untimely sought.

In light of these considerations, it is understandable why WWP is anxious to preserve the option of bringing product liability claims for economic loss under common law tort theories. We cannot, however, find a legal basis for this position. For the WPLA means nothing if it does not preempt common law product liability remedies.

To be sure, the Legislature might have stated its intent to preempt common law product liability claims more certainly than it has in the WPLA—for example, by means of an express preemption clause. *See, e.g.,* Conn. Gen. Stat. Ann. § 52–572n (West 1960 & Supp. 1988); Ohio Rev. Code Ann. § 2307.72(A) (Page 1981 & Supp. 1987); Model Uniform Product Liability Act § 103(A), 44 Fed. Reg. 62,713, 62,720 (1979). The absence of such a clause does not defeat the case for preemption, however. Clear statutory language and corroborative legislative history leave no doubt about the WPLA's preemptive purpose.

Included within the definition of "product liability claim" is

any claim or action brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product. It includes, but is not limited to, any claim or action previously based on: Strict liability in tort; negligence; breach of express or implied warranty; breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation, concealment, or nondisclosure, whether negligent or innocent; or other claim or action previously based on any other substantive legal theory except fraud, intentionally caused harm or a claim or action under the consumer protection act, chapter 19.86 RCW.

RCW 7.72.010(4). The scope of the statute could not have been stated more broadly. Further evidence of legislative intent to preempt common law remedies is found in the explanatory analysis of the WPLA prepared by the Senate Select Committee on Tort and Product Liability Reform contemporaneously with the Legislature's consideration of the measure.

> Historically, one of the most confusing areas of product liability tort law involves the variety of causes of actions—such as negligence, warranty and strict liability—available to the plaintiff seeking recovery for injuries allegedly resulting from a defective product. Testimony before the Select Committee reflected general agreement that the creation of a single cause of action, termed a "product liability claim" . . ., eliminates this confusion and should be adopted.

Senate Select Comm. on Tort and Product Liability Reform, *Final Report* 16 (Jan. 1981); *see also* Senate Journal, 47th Legislature (1981), at 616.

Washington State Trial Lawyers Association (WSTLA), appearing here as amicus curiae, discounts the preemptive effect of RCW 7.72.010(4) on the basis that that section is merely "definitional". WSTLA argues also that WPLA's reservation clause, RCW 7.72.020(1), evidences an intent to preserve common law remedies, rather than to preempt them.

Although they are well presented, we find these arguments unconvincing. WSTLA offers inadequate reasons to explain why the "definitional" nature of RCW 7.72.010(4) should diminish that provision's preemptive effect. The WPLA's definition of "product liability claim", as we have noted, is the operative centerpiece of the statute, linking together the important concepts of "claimant" and "harm" to describe the liabilities of product manufacturers and sellers for product–related injuries. We cannot dilute this definition without frustrating the entire scheme of the statute. If the "definitional" nature of RCW 7.72.010(4) is of any significance in assessing the WPLA's preemptive effect, therefore, it counsels in favor of preemption, not against it.

In the context of the statute, WSTLA's interpretation of RCW 7.72.020(1) as preservative of common law remedies also is not persuasive. This provision states:

> The previous existing applicable law of this state on product liability is modified only to the extent set forth in this chapter.

We cannot see how this defeats the preemptive effect of RCW 7.72.010(4). The definition of "product liability claim" includes "any claim or action previously based on" a nonexclusive list of product liability theories. Thus, the definition modifies "previous existing applicable law" by displacing common law causes of action.[4] RCW 7.72.020(1) recognizes and respects this modification.

■ We might decry the absence from the WPLA of a provision expressly stating the statute's intended preemptive effect on common law remedies. And we might discover among the many canons of statutory construction an arsenal of technical rules that could be deployed to defeat the cause of preemption. However, "[o]verriding all technical rules of statutory construction must be the rule of reason upholding the obvious purpose that the legislature was attempting to achieve." *State v. Coffey,* 77 Wn.2d 630, 637, 465 P.2d 665 (1970).

The WPLA would accomplish little if it were a measure plaintiffs could choose or refuse to abide at their pleasure. WSTLA concedes that if the statute is held not to preempt common law product liability remedies, it will become a

---

[4]Our holding that the WPLA preempts the variety of common law causes of action for harms caused by product defects applies also to all equitable claims for such harms. While the statutory preemptive language extends only to claims or actions "previously based on any . . . substantive *legal* theory except fraud", (italics ours), RCW 7.72.020(4), we do not believe the Legislature intended by this language to draw the careful, and to a great extent antiquated, distinction between actions at law and equity. *Cf.* Black's Law Dictionary 803 (5th ed. 1979) ("With the merger . . . of law and equity courts [effective in Washington since territorial times, *see* former RCWA 4.04.020, Historical Note, at 7], this distinction generally no longer exists."). Thus, we reject WWP's contention that it may maintain a cause of action outside the WPLA under sections 76 and 115 of the Restatement of Restitution (1937).

"white elephant remedy" that "few, if any, plaintiffs would choose to invoke". Whatever the deficiencies in the statute's construction (and we do not believe they are significant on the question of preemption), we should be very reluctant to exacerbate them by rendering the statute a nullity.

## III

Having determined that WWP's claims are governed by the WPLA, we must next determine whether the damages WWP seeks are the sort for which the WPLA affords a remedy. The "harm" for which the WPLA holds product manufacturers and sellers liable is defined by the statute to include

any damages recognized by the courts of this state: *Provided,* That the term "harm" does not include direct or consequential economic loss under Title 62A RCW.

RCW 7.72.010(6). The parties raise two issues concerning the applicability of this definition to this case. First, does the WPLA establish any remedy for "economic loss"? Second, what does the statute mean by "economic loss"?

## A

Like the preemption issue, the question of whether or not the WPLA provides a remedy for economic loss arises out of concern for contract law rules of privity. Before the WPLA was enacted in 1981, privity rules posed no barrier to product liability plaintiffs. Washington law permitted plaintiffs a tort remedy for any damages they suffered, including damages commonly characterized as "economic loss".[5] *See Berg v. General Motors Corp.,* 87 Wn.2d 584, 555 P.2d 818 (1976). Plaintiffs similarly are free from privity rules under the WPLA, *see* RCW 7.72.010(5),[6] but in a

---

[5]Generally speaking, "economic loss" describes the diminution of product value that results from a product defect. The meaning of the term is discussed more fully in the next section.

[6]RCW 7.72.010(5) provides: "A claim may be asserted under this chapter even though the claimant did not buy the product from, or enter into any contractual relationship with, the product seller [or manufacturer]."

more limited set of circumstances than under the common law. The interpretive question is how broadly or narrowly the WPLA defines this limitation.

The limitation arises from the WPLA's definition of "harm", quoted above. But for the qualification "under Title 62A RCW"—or, "under [the U.C.C.]"—the exclusion of "economic loss" from the statutory definition of "harm" would be readily understandable. The economic loss exclusion was "taken substantially" from a definition of "harm" contained in the Model Uniform Product Liability Act (MUPLA), 44 Fed. Reg. 62,713. Senate Select Comm. on Tort and Product Liability Reform, *Final Report* 30 (Jan. 1981). Indeed, the two exclusions are identical, except that MUPLA's ends after the word "loss". MUPLA § 102(F), 44 Fed. Reg. 62,717. Thus, the scope of the MUPLA exclusion provides useful guidance on the intended scope of the WPLA exclusion.

■ Commentary on the MUPLA exclusion prepared by MUPLA's drafters explains that the exclusion reflects the position of the majority of common law jurisdictions that restrict product liability plaintiffs to contract remedies for economic loss. *See* 44 Fed. Reg. 62,719. The common understanding of Washington commentators is that the WPLA also operates this way, overruling this court's decision in *Berg v. General Motors Corp.,* 87 Wn.2d 584, 555 P.2d 818 (1976).[7] *See* Comment, *Recovery of Pure Economic Loss in Product Liability Actions: An Economic*

---

[7]The *Berg* decision placed Washington in the company of a steadily dwindling minority of jurisdictions that permit tort–based actions for economic loss. *See, e.g., Santor v. A&M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965) (leading case for this position). The opposing majority view, which *Berg* rejected as "specious", *see Berg,* at 592, distinguishes "economic loss" from physical damage to persons or property, permitting only contract remedies for those damages that constitute "economic loss". "The distinction", in the majority view,

> rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his

*Comparison of Three Legal Rules,* 11 U. Puget Sound L. Rev. 283, 290 (1988); Washington State Bar Ass'n, *Commercial Law Deskbook* §§ 32.7(3), 32.7(6) (1987); Talmadge, *Washington's Product Liability Act,* 5 U. Puget Sound L. Rev. 1, 10 (1981). We agree that this is a proper interpretation of the statute.

The additional reference in the WPLA exclusion to "Title 62A RCW" does not appear to require a different construction. It is difficult to account for this language, which, as mentioned, does not appear in the MUPLA, nor for that matter in any other product liability statute that employs an economic loss limitation. *See* Conn. Gen. Stat. Ann. § 52–572m(d) (West Supp. 1988) ("As between commercial parties, 'harm' does not include commercial loss."); Ind. Code Ann. § 33–1–1.5–2 (Burns Supp. 1988) ("'Physical harm' . . . does not include gradually evolving damage to property or economic losses from such damage."); Kan. Stat. Ann. § 60–3302(d) (1983) ("'Harm' . . . does not include direct or consequential economic loss."); Ohio Rev. Code Ann. § 2307.71(B), (G) (Page Supp. 1987) ("Harm is not 'economic loss'" and "[e]conomic loss is not 'harm.'"). The difficulty in understanding the reference to the U.C.C. is that it is ungrammatical; a verb or adjective connecting "economic loss" with "under Title 62A RCW" appears inadvertently to have been omitted. But none of the legislative materials addressing the WPLA provides any indication of what the missing word might be.

A few possibilities have been suggested. One commentator has explored the possibility that the U.C.C. reference is intended to incorporate a U.C.C. definition of "economic loss". Unfortunately, the U.C.C. contains no such definition. *See* Washington State Bar Ass'n, *Commercial Law Deskbook* § 32.7(2) (1987). WWP suggests that the omitted

---

products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands.

*Seely v. White Motor Co.,* 63 Cal. 2d 9, 18, 403 P.2d 145, 45 Cal. Rptr. 17 (1965); *see also East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986) (adopting this position in the law of admiralty).

connecting word is "recoverable": only economic loss that is actually recoverable under the U.C.C. is excluded from the WPLA's definition of "harm". The word "recoverable" does not appear in the statute, however, and for us to interpolate it would be both improper and unwise. Under WWP's construction, product liability plaintiffs would *always* be able to recover damages for economic loss—under the U.C.C. when they can do so (when they are in privity with the defendant) and under the WPLA in all other circumstances. Rather than giving the exclusionary clause a sensible meaning, therefore, WWP's proposed construction would render the clause a nullity.[8]

In the final analysis, we must agree that the phrase "under Title 62A RCW", in the context of the WPLA's economic loss exclusion, "does nothing except add confusion, and should be ignored." Washington State Bar Ass'n, *Commercial Law Deskbook* § 32.7(5) (1987). Our best guess is that the phrase is mere surplusage, perhaps unintentionally carried over as a stylistic parallel to RCW 7.72.020(2). We do not casually choose to neglect the Legislature's words. *See United Parcel Serv., Inc. v. Department of Rev.,* 102 Wn.2d 355, 361–62, 687 P.2d 186 (1984) ("Statutes are to be construed, wherever possible, so that 'no clause, sentence or word shall be superfluous, void, or insignificant'."). In this instance, however, we believe a proper understanding of the exclusionary clause in the "harm" definition, and of the WPLA as a whole, requires us to do so. *Cf.* 2A N. Singer, *Statutory Construction* § 47.37 (4th ed. 1984) (surplusage in a statute may be ignored in order to subserve legislative intent).

---

[8]On this point, the MUPLA commentary is again instructive in its description of the increased insurance costs that result when consequential economic losses are recoverable from a noncontracting party. *See* MUPLA, 44 Fed. Reg. 62,713, 62,719 (1979). In light of the WPLA's underlying concern with insurance costs, it is reasonable to conclude that the Legislature intended that there be *some* limit on economic loss recovery. *See also* RCW 7.72.020(2) (provision preserving availability of damages for economic loss under the U.C.C., suggesting that the WPLA limits such damages).

## B

To summarize our discussion thus far: We have held that the WPLA creates a single cause of action for product–related harms that supplants previously existing common law remedies. We have held also that this cause of action does not afford a remedy for "economic loss". Now we must determine what this "economic loss" is that is not remediable under the WPLA.

Neither the WPLA nor any other legislative materials related to the statute define "economic loss", and the term has no singular meaning in the law. The broadest definition, favored by defendants in this case, encompasses all damages attendant to the failure and loss of use of a product.[9] *See, e.g., East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986); Ohio Rev. Code Ann. § 2307.71(B) (Page 1981 & Supp. 1987) ("economic loss" includes "damage to the product in question"). WWP favors a more restrictive definition, which holds that a product's self–inflicted injury should not be characterized as economic loss if the injury results from a hazardous defect. *See, e.g., Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165 (3d Cir. 1981); *Sanco, Inc. v. Ford Motor Co.,* 579 F. Supp. 893, 898–99 (S.D. Ind. 1984), *aff'd,* 771 F.2d 1081 (7th Cir. 1985) (dicta suggesting this definition for Indiana product liability act); *cf.* Conn. Gen. Stat. Ann. § 52–572m(d) ("'[h]arm' includes damage to property, including the product itself"). In this litigation, WWP describes this definition as based on a "risk of harm" analysis.

■ This court recently indicated support for risk of harm analysis in *Stuart v. Coldwell Banker Comm'l Group, Inc.,* 109 Wn.2d 406, 417–22, 745 P.2d 1284 (1987). *Stuart*

---

[9]Such damages are of two sorts. Direct economic loss is damage based on inadequate product value and may be measured by the costs of repairing and replacing the defective product. Indirect or consequential economic loss refers to other damages proximately caused by the loss of use of the product (*e.g.,* lost profits). *See generally* Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum. L. Rev. 917, 918 (1966).

involved a claim for negligent construction brought by a homeowners association against the builder–vendor of a condominium complex. The trial court had allowed the claim, but this court reversed, finding a tort remedy inappropriate for the damages pleaded. In reaching this conclusion, the court adopted the definition of economic loss set forth in *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co., supra*:

> [W]here only the defective product is damaged, the court should identify whether the particular injury amounts to economic loss or physical damage. In drawing the distinction, the determinative factor should not be the items for which damages are sought, such as repair costs. ["]Rather, the line between tort and contract[10] must be drawn by analyzing interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose. These factors bear directly on whether the safety–insurance policy of tort law or the expectation–bargain protection policy of warranty law is most applicable["] to the claim in question. *Pennsylvania Glass Sand*, at 1173.

*Stuart*, at 420–21.

Defendants criticize *Stuart* for failing to acknowledge the flat rejection of the risk of harm approach by the United States Supreme Court. In *East River S.S. Corp. v. Transamerica Delaval, Inc., supra,* the plaintiffs sued in tort to recover the costs of repairing defective supertanker turbines, and income lost when the turbines failed to operate properly. Two lower federal courts dismissed the plaintiffs' claims, and the Supreme Court affirmed. Exercising its authority to determine the substantive admiralty law, the Court examined the policy justifications pro and con permitting a tort cause of action, and ultimately concluded that "a manufacturer in a commercial relationship has no

---

[10]As discussed in footnote 7, the term "economic loss" is a conceptual device used to distinguish damages thought properly remediable only in contract from damages for which a tort remedy is deemed permissible. Thus, under the *Pennsylvania Glass Sand* analysis, economic loss describes those damages falling on the contract side of "the line between tort and contract".

duty under either a negligence or strict products–liability theory to prevent a product from injuring itself." *East River*, at 871.

In its opinion, the Court assessed the relative merits of several different conceptions of economic loss. For purposes of the law of admiralty, it chose the conception that defendants urge us to adopt under the WPLA. When a product damages only itself, and not persons or other property, the Court held, the proper remedy lies in contract, not in tort, no matter what risk of harm the product defect poses, and no matter how the product injury occurred. Citing directly to *Pennsylvania Glass Sand*, the Court rejected the risk of harm approach, deeming it "too indeterminate to enable manufacturers easily to structure their business behavior." *East River*, at 870. In an apparent response to *Pennsylvania Glass Sand*'s suggestion that the risk of harm the product defect presents, rather than nature of the damages actually suffered, should determine whether a given product injury properly can be characterized as economic loss compensable only in contract, or property damage remediable as a tort, *see Pennsylvania Glass Sand*, at 1173, the Court declared:

> We realize that the damage [a product suffers] may be qualitative, occurring through gradual deterioration or internal breakage. Or it may be calamitous. But either way, since by definition no person or other property is damaged, the resulting loss is purely economic. Even when the harm to the product itself occurs through an abrupt, accident–like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law.

(Citations omitted.) *East River*, at 870.[11]

---

[11]On this view, the Court in *East River* treated as economic loss damages incurred when a turbine had failed at sea in a storm, notwithstanding that this particular product failure "posed a serious risk to persons, property, and the product itself in the event the power failure occurred when there was some unrelated danger at sea that required a vessel with full power." *East River S.S. Corp.*

The Supreme Court's *East River* opinion has persuaded a number of courts to abandon risk of harm analysis. The Third Circuit, which had imputed the risk of harm approach into Pennsylvania law in *Pennsylvania Glass Sand,* now predicts that because *East River* is "so persuasive", the *East River* definition "will be followed by Pennsylvania courts." *Aloe Coal Co. v. Clark Equip. Co.,* 816 F.2d 110, 117 (3d Cir.), *cert. denied,* ___ U.S. ___, 98 L. Ed. 2d 111, 108 S. Ct. 156 (1987). A federal district judge has predicted that California and Illinois will do likewise.[12] *See PPG Indus., Inc. v. Sundstrand Corp.,* 681 F. Supp. 287, 291 (W.D. Pa. 1988). Similarly, defendants urge us to abandon the approach we embraced in *Stuart* and join the courts that have accepted the *East River* view.

Of special relevance to our present task of ascribing meaning to "economic loss" in the context of the WPLA is *East River*'s observation that the risk of harm approach is "too indeterminate". An essential purpose of tort reform in Washington was to address "[u]ncertainties within the tort system [that] have resulted in increasing insurance costs for product manufacturers, wholesalers, retailers and other parties in the chain of distribution of a product . . ." S. Res. 140, 46th Legislature, 1st Ex. Sess. (1979); *see* Talmadge, *Washington's Product Liability Act,* 5 U. Puget Sound L. Rev. 1, 5–6 (1981). To the extent risk of harm analysis increases uncertainty in tort litigation, therefore, the analysis may be ill suited to provide the missing statutory definition. See generally Brief of Amicus Washington Defense Trial Lawyers Association, at 3–15.

---

*v. Delaval Turbine, Inc.,* 752 F.2d 903, 915 (3d Cir. 1985) (en banc) (Becker, J., concurring and dissenting) (arguing that, under *Pennsylvania Glass Sand,* tort claim should lie for these damages).

[12]The predicted California reversal is especially significant, as Chief Justice Traynor's landmark opinion in *Seely v. White Motor Co.,* 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17 (1965), provided the basis for the risk of harm approach. *See Seely,* at 18 ("[A manufacturer] can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm.").

The *East River* approach, on the other hand, appears to provide more certainty. First, by restricting product injury claims to contract theories, the approach gives manufacturers the means to limit their liabilities to predictable plaintiffs and manageable sums. *See East River,* at 874. Second, by replacing awkward assessments of such imponderables as "the type of risk" with a bright–line rule, *East River* reduces uncertainty in judicial decisionmaking.

In our opinion, however, this increased certainty comes at too high a price. If manufacturers can contract successfully around liabilities for product injuries, a principal deterrent to unsafe practices—the threat of legal liability—will be lost. *See Cloud v. Kit Mfg. Co.,* 563 P.2d 248, 250–51 (Alaska 1977); *Salt River Project Agricultural Imp. & Power Dist. v. Westinghouse Elec. Corp.,* 143 Ariz. 368, 694 P.2d 198, 211 (1984); *Mid Continent Aircraft Corp. v. Curry Cy. Spraying Serv., Inc.,* 572 S.W.2d 308, 316–18 (Tex. 1978) (Pope, J., dissenting). We do not believe this is what the Legislature intended when it enacted the WPLA. Like the common law actions they displaced, the causes of action authorized by the WPLA place liability for injuries resulting from hazardous product defects on the manufacturers and distributors who are best positioned to avoid those injuries. In this respect, the WPLA preserves the common law's concerns with product safety.[13] *Cf.* Model Uniform Product Liability Act, 44 Fed. Reg. 62,713, 62,715 (1979) (identifying safety promotion as a formative concern of product liability legislation).

The Court's analysis in *East River,* we believe, unjustifiably dismisses the safety concerns attendant to product injuries caused by hazardous defects. For this reason, we find *East River*'s approach to economic loss unsuited to what the Legislature intended under the WPLA. Product

---

[13]Safety long has been an important concern of Washington product liability law. *See Mazetti v. Armour & Co.,* 75 Wash. 622, 135 P. 633 (1913); *Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 452 P.2d 729 (1969); *see generally* Comment, *Product Liability Reform Proposals in Washington—A Public Policy Analysis,* 4 U. Puget Sound L. Rev. 143, 146 (1980).

injuries, the Court says, do not raise safety concerns, but are "essentially" a performance problem. *East River,* at 870. It does not say why this is so, however. *Cf. Mid Continent Aircraft Corp. v. Curry Cy. Spraying Serv., Inc., supra* at 316–17 (Pope, J., dissenting).[14] Also unsupported is the Court's assertion that "[t]he tort concern with safety is reduced when an injury is only to the product itself." *East River,* at 871. Listing the types of losses product injury generates, and remarking that "[l]osses like these can be insured", *East River,* at 871–72, the Court says nothing to explain why safety concerns are not implicated.[15]

In contrast to the *East River* approach, risk of harm analysis appropriately accommodates the safety and risk–spreading policies that underlie the law of product liability, and "provides a workable and accurate distinction between accidents that should be actionable in tort and losses that should remain in the domain of warranty law." Comment, *Asbestos in Schools and the Economic Loss Doctrine,* 54 U. Chi. L. Rev. 277, 300 (1987). Under this analysis, the fact

---

[14]Responding to Dean Keeton's contention that "a damaging event that harms only the product should be treated as irrelevant to policy considerations directing liability placement in tort", Keeton, *Annual Survey of Texas Law, Torts,* 32 Sw. L.J. 1, 5 (1978), Justice Pope asks: "Why?" The case of a hazardous defect that causes an accident injuring the defective product presents "the same defect, the same unreasonableness, the same dangerousness, and the same accident that would have supported an action for damages for personal injuries and to 'other' property. The elimination of those criteria as to the product itself is at best an arbitrary distinction, and I find no policy reason to justify it." *Mid Continent Aircraft Corp.,* at 316–17.

[15]We are not the first court *East River* has failed to persuade against the risk of harm approach. In *Bancorp Leasing & Fin. Corp. v. Agusta Aviation Corp.,* 813 F.2d 272, 277 (9th Cir. 1987), the Ninth Circuit predicted that, *East River* notwithstanding, Oregon will adhere to the risk of harm approach it adopted in *Russell v. Ford Motor Co.,* 281 Or. 587, 575 P.2d 1383 (1978). And in *Greenville v. W.R. Grace & Co.,* 827 F.2d 975, 976–78 (4th Cir. 1987), the Fourth Circuit predicted that South Carolina would follow risk of harm analysis in asbestos cases. *See also Board of Educ. v. A,C&S, Inc.,* 171 Ill. App. 3d 737, 525 N.E.2d 950 (1988) (applying risk of harm analysis in asbestos case; no substantive discussion of *East River*).

that a hazardous product defect has injured only the product itself, and not persons or other property, is properly regarded as a "pure fortuity". *Consumers Power Co. v. Curtiss–Wright Corp.*, 780 F.2d 1093, 1099 (3d Cir. 1986). Thus, the same remedy is made available for this sort of injury as would be available if the product defect had injured something or someone else. *See, e.g., Consumers Power Co. v. Curtiss–Wright Corp., supra* at 1099; *Cloud v. Kit Mfg. Co., supra.* "[N]o logical distinction" exists between these circumstances to justify different treatment under the law. *Seely v. White Motor Co.*, 63 Cal. 2d 9, 22, 403 P.2d 145, 45 Cal. Rptr. 17 (1965) (Peters, J., concurring and dissenting). And no evidence exists that the Legislature intended to create the distinction that logic does not sanction.

To say that the WPLA incorporates the risk of harm approach to economic loss does not fully answer the question certified by the federal court, however. Further refinement of the analysis is necessary to determine the sort of remedy that is available to WWP with respect to its insulator replacement plans. A majority of courts that follow the risk of harm approach apply a "sudden and dangerous test", distinguishing economic loss from other damages principally according to the manner in which the product failure has occurred. If the failure is the result of a sudden and dangerous event, it is remediable under tort principles. If no such event has occurred, the product failure is deemed economic loss. *See, e.g., Cloud v. Kit Mfg. Co., supra* at 250–51; *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1171–73, 1174–75 (3d Cir. 1981); *cf. Stuart v. Coldwell Banker Comm'l Group, Inc.*, 109 Wn.2d 406, 421, 745 P.2d 1284 (1987) (tort recovery for balcony rotting unavailable for this reason). Opposed to this "sudden and dangerous" test is a more evaluative approach that proceeds on the theory that a product user should not have to suffer a calamitous event before earning his remedy. *See, e.g., Stuart v. Coldwell Banker Comm'l Group, Inc., supra* at 425 (Callow, J., concurring in part,

dissenting in part); *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill. 2d 69, 97–98, 435 N.E.2d 443 (1982) (Simon, J., specially concurring); *Seely v. White Motor Co.*, 63 Cal. 2d 9, 22 n.2, 403 P.2d 145, 45 Cal. Rptr. 17 (1965) (Peters, J., concurring and dissenting). *See generally Kishwaukee Comm'ty Health Servs. Ctr. v. Hospital Bldg. & Equip. Co.*, 638 F. Supp. 1492, 1497–98 (N.D. Ill. 1986) (describing "actual" and "potential" versions of risk of harm formula). We do not now decide which of these approaches is appropriate under the scheme of the WPLA. Neither the parties nor the amici curiae have addressed this issue, and, insofar as the case is moot and a definitive answer is not necessary to assist the federal court, we defer the question to a future case.

IV

In response to the questions certified from the federal court, we hold that the WPLA preempts common law remedies; that the statute provides no remedy for "economic loss"; and that "economic loss" within the context of the statute is determined by a risk of harm analysis.

CALLOW, C.J., and UTTER, BRACHTENBACH, DOLLIVER, PEARSON, ANDERSEN, and SMITH, JJ., concur.

DORE, J., concurs in the result.

After modification, further reconsideration denied September 27, 1989.