[No. 22084-9-II. Division Two. July 16, 1999.]

STATON HILLS WINERY COMPANY, LIMITED, *Appellant*, v. LESTER L. COLLONS, ET AL., *Respondents*.

*Iro Richard Lassman,* for appellant.
*Ross Edwin Taylor,* for respondents.

SEINFELD, J. — Staton Hills Winery Company appeals a summary judgment dismissing its breach of contract and negligence action against Lester Collons. Our disposition of this case turns on whether the Winery has a claim under the Washington products liability act (WPLA) for the defective tank that Collons sold the Winery and for the Winery's subsequent loss of the wine stored in the tank. Applying risk of harm analysis, we agree that WPLA's exclusion for consequential economic losses, RCW 7.72- .010(6), applies. Thus, we affirm.

## FACTS

In June 1988, the Winery prepared a purchase order for five steel tanks that it planned to use for temporary wine storage. The order required Collons to sandblast the interior of the tanks and then to apply two coats of food-grade epoxy. Collons delivered the tanks to the Winery in July 1988.

In late 1989 or early 1990, the Winery filled the tank involved in this lawsuit with 5,148 gallons of Sauvignon Blanc wine.[1] It then sealed the tank. When the Winery opened the tank on October 1, 1990, the wine's odor and taste indicated that the wine was spoiled. Salvage efforts were unsuccessful and the Winery had to discard the tank's entire contents. The Winery later determined that the epoxy coating had peeled away from the tank's interior walls, placing the wine in contact with the steel and allowing hydrocarbon contamination.

On June 1, 1993, the Winery filed this lawsuit. It alleged

---

[1]The Winery alleged that the wine had a retail value of $18.72 per gallon and a bottled wholesale value of $96,370.

that Collons had negligently applied the epoxy coating and breached the purchase agreement by delivering a tank that did not conform to contract specifications. Collons moved for summary judgment, alleging that the Uniform Commercial Code's (UCC) four-year statute of repose, RCW 62A.2-725, barred the Winery's claims. Under the UCC, the Winery's claims expired in July 1992, four years after Collons delivered the tanks and nearly a year before the Winery filed its action.

In response, the Winery urged the trial court to allow it to proceed on its products liability theory. The WPLA statute of limitations did not expire until October 1993, three years after the Winery discovered the defect and four months after it filed this lawsuit.

The trial court found that that the Winery's claims for the defective storage tank and for the lost wine were "economic losses" specifically excluded from coverage by WPLA. *See* RCW 7.72.010(6). Thus, it granted Collons' motion and dismissed the lawsuit. The Winery appeals.

## DISCUSSION

There is no dispute that UCC remedies for breach of contract would be applicable to this claim, but for the running of the statute of repose. UCC coverage, however, does not necessarily exclude WPLA remedies for a defective product. Thus, we must determine whether the Winery also could seek recovery under WPLA.

A party may sue under WPLA for:

any claim or action brought for *harm* caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product. It includes, but is not limited to, any claim or action previously based on: Strict liability in tort; negligence; breach of express or implied warranty; breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation, concealment, or nondisclosure,

whether negligent or innocent; or other claim or action previously based on any other substantive legal theory except fraud, intentionally caused harm or a claim or action under the consumer protection act, chapter 19.86 RCW.

RCW 7.72.010(4) (emphasis added). Essentially, "harm" includes "any damages recognized by the courts of this state" except "direct or consequential economic loss under Title 62A RCW." RCW 7.72.010(6).

Neither WPLA, nor RCW 62A, nor case law defines the phrase "direct or consequential economic loss."[2] Instead, WPLA's legislative history and the case law discussing both WPLA's economic loss exclusion and the common law economic loss rule focus primarily upon policy considerations.[3] Thus, we look to these policy underpinnings for guidance.

■ There is substantial agreement as to the legislative intent in adopting the economic loss exclusion. A major purpose of the exclusion is to preserve the distinction between contract law, with its focus on enforcing expectations created by agreement, and tort law, which focuses on protecting people and property by imposing a duty of reasonable care on others. *Berschauer/Phillips Constr. v. Seattle Sch. Dist. No. 1,* 124 Wn.2d 816, 821, 881 P.2d 986 (1994), *review denied,* 135 Wn.2d 1010 (1998); *Washington*

---

[2]Pursuant to the UCC, a buyer's "incidental damages" result from the seller's breach and include expenses related to dealing with rejected goods, costs "effecting cover," and expenses incidental to delay or other breach. RCW 62A.2-715(1). "Consequential damages" result from the seller's breach and include:

(a) any loss resulting from general or particular requirements and need of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty.

RCW 62A.2-715(2). Because consequential damages include both economic and noneconomic losses, this definition provides little guidance in the WPLA context.

[3]*See Berschauer/Phillips Constr. v. Seattle Sch. Dist. No. 1,* 124 Wn.2d 816, 822-28, 881 P.2d 986 (1994), *review denied,* 135 Wn.2d 1010 (1998); *Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.,* 119 Wn.2d 334, 350-55, 831 P.2d 724 (1992); *Washington Water Power Co. v. Graybar Elec. Co.,* 112 Wn.2d 847, 856-66, 774 P.2d 1199, 779 P.2d 697 (1989); *Stuart v. Coldwell Banker Commercial Group, Inc.,* 109 Wn.2d 406, 418-21, 745 P.2d 1284 (1987).

*Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 861 n.10, 774 P.2d 1199, 779 P.2d 697 (1989); Laws of 1981, ch. 27, § 1; Philip A. Talmadge, *Washington's Product Liability Act*, 5 U. Puget Sound L. Rev. 1, 10 (1981). As the Legislature stated:

> It is the intent of the legislature that the right of the consumer to recover for injuries sustained as a result of an unsafe product not be unduly impaired. It is further the intent of the legislature that retail businesses located primarily in the state of Washington be protected from the substantially increasing product liability insurance costs and unwarranted exposure to product liability litigation.

Laws of 1981, ch. 27, § 1.

Holding a manufacturer or distributor of products liable in tort for an unsafe product that creates an unreasonable risk of harm to persons or property furthers the safety-insurance policy of tort law, which has traditionally redressed injuries classified as physical harm or property damage. *Graybar*, 112 Wn.2d at 864; *Stuart v. Coldwell Banker Commercial Group, Inc.*, 109 Wn.2d 406, 420, 745 P.2d 1284 (1987) (citing William L. Prosser, Handbook of the Torts § 101, at 665 (4th ed. 1971)). But tort law policies are not applicable where a product's defect is merely its failure to meet the purchaser's expectation. In that case, the purchaser has the ability to self-protect during the bargaining process; it would violate contract law to allow the purchaser to recover more in tort litigation than it could obtain in the contract bargaining process. *Berschauer/Phillips*, 124 Wn.2d at 827.

When the only damage claim is for the defective product itself, and not persons or other property, the Washington Supreme Court has held that a "risk of harm" analysis is applicable to determine whether the claim fits within the economic loss exclusion. *Graybar*, 112 Wn.2d at 855-67 (only issue was whether claim for replacement of defective insulators constituted an economic loss); *Stuart*, 109 Wn.2d at 420 (only claim was for construction defects

in condominium decks and walkways). The risk of harm approach requires consideration of the particular circumstances, looking to factors such as the nature of the defect, the type of risk it posed, and the manner in which the injury arose. *Graybar*, 112 Wn.2d at 861, 866; *Stuart*, 109 Wn.2d at 420-21.

> These factors bear directly on whether the safety-insurance policy of tort law or the expectation-bargain protection policy of warranty law is most applicable to the claim in question.

*Graybar*, 112 Wn.2d at 861 (citing *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1173 (3d Cir. 1981)); *Stuart*, 109 Wn.2d at 421.

In adopting a risk of harm analysis, the *Graybar* court declined to follow the bright-line approach taken by the United States Supreme Court in *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S. Ct. 2295, 90 L. Ed. 2d 865 (1986). The *East River* Court concluded that, under substantive admiralty law, there can never be tort recovery when a defective product damages only itself and not persons or other property. This is because "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *East River*, 476 U.S. at 871; *see also Graybar*, 112 Wn.2d at 861-62.

In contrast to the *East River* approach, the Washington Supreme Court viewed the fact that a defective product happened to injure only the product itself, and not persons or other property, as a "pure fortuity." *Graybar*, 112 Wn.2d at 866. Thus, under proper circumstances, a plaintiff could obtain a tort remedy for a defective product that injured only itself. The *Graybar* court did not decide, however, whether there must be a "sudden and dangerous" or "calamitous" event before a plaintiff could seek a tort remedy. *Graybar*, 112 Wn.2d at 866-67; *see also Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wn.2d 334, 351, 831 P.2d 724 (1992). Because *Graybar* involved a certified question from federal district court, it

was not necessary for the Supreme Court to apply the risk of harm analysis to the facts there.

The Supreme Court first applied a risk of harm analysis in *Touchet Valley*. There, a grain storage building fell apart when it was filled with the amount of grain it was designed to hold; parts of the building twisted, bent, and pulled loose causing a wall panel to suddenly fall to the ground, which in turn allowed moisture and pests to destroy the grain. *Touchet Valley*, 119 Wn.2d at 352-53. Under breach of warranty and products liability theories, the building owner sought recovery for both the defective building and the damaged grain. *Id.* at 339, 354.

██ ██ Applying both a "sudden and dangerous" test and an "evaluative approach,"[4] the *Touchet Valley* court found that the building was unreasonably unsafe from the time it was filled with grain and that the falling wall posed a "real and nonspeculative" threat to persons and property. 119 Wn.2d at 353-54. The *Touchet Valley* court concluded that the circumstances implicated the safety-insurance policies of tort law, the building owner's losses were more than economic, and therefore WPLA applied. 119 Wn.2d at 353-55.

Here, unlike in *Touchet Valley*, the Winery did not suffer a "sudden and dangerous" or "calamitous" event. Thus, under the "sudden and dangerous" test, the tank's failure would be a pure economic loss. *See Graybar*, 112 Wn.2d at 866; *Stuart*, 109 Wn.2d at 420-21. But because the Supreme Court has not indicated that the sudden and dangerous test is determinative, we also apply the "evaluative approach" to decide whether the Winery's losses constitute

---

[4]Under the "sudden and dangerous" test, followed by a majority of courts, economic losses are distinguished from other damages principally according to the manner in which the product failure occurred. *Graybar*, 112 Wn.2d at 866. If a product's failure is the result of a sudden and dangerous event, it is remediable in tort; if not, the product failure is deemed an economic loss. *Id.* Under the "evaluative approach," the court considers (1) the nature of the defect; (2) the type of risk; and (3) the manner in which the injury arose. *Touchet Valley*, 119 Wn.2d at 353 (citing *Pennsylvania Glass*, 652 F.2d at 1173). This approach presumes that a product user may obtain a tort remedy without suffering a calamitous event. *Graybar*, 112 Wn.2d at 866.

more than pure economic harm. *See Touchet Valley*, 119 Wn.2d at 352.

(1) Nature of the Defect

The first factor under the evaluative approach is the nature of the defect, which here was the failure of the epoxy to adhere to the tank. The epoxy failure was a defect precisely because it did not fulfill contract requirements or meet the Winery's particular needs. The tank was not generally defective; it did not leak, explode, or come apart. Thus, as applied to the tank, this factor implicates the "expectation-bargain protection" policies of contract law and does not implicate the safety insurance policies of tort law. *Graybar*, 112 Wn2d. at 861. The same analysis is applicable when we consider the nature of the defect with regard to the other property, the wine.

(2) Type of Risk

The second risk of harm factor is the type of risk posed by the product's defect. This factor has multiple components. First, we consider the magnitude of risk the product's defect posed to itself, to other property, or to persons. For example, a significant risk to persons would likely always implicate tort policy, whereas a risk to other property might not be determinative.

Next, we consider the extent to which the risk was foreseeable and whether the product purchaser had the bargaining capacity to limit its exposure to the risk. Where the risk was foreseeable and the parties were bargaining at arms length, contract policies are implicated. But tort policies come into play where it would have been difficult to anticipate the harm or where the parties had disparate bargaining positions. Finally, we consider whether the risk that the defective product would harm other property included a further risk to persons or additional other property.

Here, there was no unreasonable risk of harm to people or property. The risk posed by the negligent application of the epoxy was that the epoxy would not properly adhere to the metal tank, thereby failing to protect the wine from

contact with the metal. Unlike the falling wall panel in *Touchet Valley*, the peeling epoxy did not pose a risk of harm to any person or property, other than the wine inside. Further, the Winery contemplated the risk of spoiled wine when it prepared a purchase order for tanks that were to be sandblasted and then coated with two layers of a food-grade epoxy material. Finally, the spoiled wine did not pose a further risk to persons or other property as the hydrocarbon contamination was not toxic and was readily apparent when the Winery opened the tank. Thus, this factor supports the application of contract law and not tort law to both the defective tank and the spoiled wine.

(3) Manner of Injury

The last factor we consider is the manner in which the injury occurred. The injury to the tank was the peeling epoxy. The record shows only that the tank was delivered in July 1988 and the defect in the tank was first discovered more than two years later. The injury to the wine was the hydrocarbon contamination. Here, there is evidence that the chemical reaction produced by the wine-steel contact caused the wine to deteriorate gradually. Unlike in *Touchet Valley*, where a 24- by 27-foot wall panel fell suddenly to the ground, there is no evidence that either the harm to the tank or to the wine resulted from a sudden and calamitous event. Nor was it a mere fortuity that the spoiled wine did not cause harm to persons. *See Touchet Valley*, 119 Wn.2d at 354. Thus, this factor also supports the application of contract law and not tort law.

Based upon our application of the relevant factors to the particular circumstances here, we conclude that Collons' alleged failure to meet contract requirements was the type of product performance claim that is properly remediable only under breach of warranty law. Although we do not suggest that the economic loss exclusion will always apply to a claim for harm to other property, here WPLA's economic loss exclusion, RCW 7.72.010(6), applies to both the defective tank and the spoiled wine.

The Winery argues against application of a risk of harm

analysis, contending that we instead should adopt a bright-line rule with respect to its claim for the wine. It contends that the economic loss exclusion never applies to claims for physical damage to other property where a defective product caused the damage. For support, it relies heavily on isolated language in *Stanton v. Bayliner Marine Corp.*, 123 Wn.2d 64, 80, 866 P.2d 15 (1993) ("plaintiffs may assert a claim in tort for economic damage which goes beyond the product itself") (citing *Sherman v. Johnson & Towers Baltimore, Inc.*, 760 F. Supp. 499, 502-03 (D. Md. 1990)); *Touchet Valley*, 119 Wn.2d at 351 ("WPLA confines recovery to physical harm of persons and property and leaves economic loss, standing alone, to the Uniform Commercial Code"); and *Graybar*, 112 Wn.2d at 857 n.7, 865 n.14 (distinguishing " 'economic loss' from physical damage to persons or property, permitting only contract remedies for those damages that constitute 'economic loss' "; "hazardous defect that causes an accident injuring the defective product presents 'the same defect, the same unreasonableness, the same dangerousness, and the same accident that would have supported an action for damages for personal injuries and to "other" property' ") (citing *Berg v. General Motors Corp.*, 87 Wn.2d 584, 592, 555 P.2d 818 (1976); *Mid Continent Aircraft Corp. v. Curry County Spraying Serv., Inc.*, 572 S.W.2d 308, 316-17, (Tex. 1978) (Pope, J., dissenting)).

The quoted language in these cases, read in context, does not support the Winery's argument for a bright-line rule. *Stanton* applied *East River*'s federal admiralty rule rather than Washington's definition of "economic loss." Thus, *Stanton* is not applicable here. *Touchet Valley*, as discussed above, is factually distinguishable as to both the type of risk and the manner in which the injury occurred. Because the *Touchet Valley* court decided that the harm to the building itself came within WPLA, it did not separately consider whether the harm to the building's contents would have been recoverable if the building's defects had not made it unreasonably unsafe to persons and property.

As in *Touchet Valley*, the *Graybar* court was not con-

fronted with a claim for damages caused to other property by a defective product not covered by WPLA. In any event, *Graybar*, which rejected a bright-line rule precluding WPLA coverage for harm only to defective products, does not support the adoption of the converse—a bright-line rule favoring WPLA coverage for harm to "other property." Although the *Graybar* court acknowledged that a bright-line rule increased certainty in judicial decision making, it determined that the benefit of certainty would come "at too high a price." 112 Wn.2d at 864. The court reasoned that the absence of a tort remedy would eliminate "a principal deterrent to unsafe practices" because "manufacturers [could] contract successfully around liabilities for product injuries." *Id.*

Here, also, the price of a bright-line rule would be high. To allow automatic recovery in tort for damages a defective product causes to other property, regardless of the particular circumstances, would in some cases defeat the expectations created by agreement where the product was not unreasonably unsafe. Because the *Graybar* court was more concerned about striking the proper balance between competing contract and tort policies than achieving certainty in judicial decision making, *Graybar* does not support the Winery's argument for a bright-line rule.

Further, our application of a risk of harm analysis is consistent with the majority of decisions from jurisdictions that have specifically dealt with injuries to "other property" caused by defective products.[5] Although the analysis varies, the majority of courts generally avoid a bright-line

---

[5]Although numerous cases from other state and federal jurisdictions discuss the "economic loss" rule, stating generally that "physical harm" is recoverable in tort whereas pecuniary losses are recoverable only in contract, the cases we cite here specifically address harm that a defective product causes to "other property."

The reasoning in the following cases is consistent with our risk of harm analysis:

*Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1183 (4th Cir. 1997) (coin collection stolen from defective safe; held: although claim was for harm to other property, economic loss rule precludes tort recovery because safe did not protect coin collection in accordance with consumer's expectations);

rule and, instead, consider such factors as (1) whether the

*Dakota Gasification Co. v. Pascoe Bldg. Sys.*, 91 F.3d 1094, 1099 (8th Cir. 1996) (defective structural steel components in natural gas plant caused damage to other property; held: economic loss doctrine precludes tort recovery because property damage was a foreseeable result of defect when parties determined their respective exposure to risk);

*Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 242 (6th Cir. 1994) (defective power plant pipe caused explosion damaging pipe and causing substantial damage to power generation facility; held: over $20 million in damages were economic losses nonrecoverable in tort based on the utility company's commercial expectations, the nature of the product's use, and the sophistication and relevant bargaining power of the parties);

*Chicago Heights Venture v. Dynamit Nobel of Am., Inc.*, 782 F.2d 723, 728-29 (7th Cir. 1986) (defective roofing material separated from the roof during storm resulting in water damage to ceiling and walls of lower floors; held: claim for damages to building was an economic loss because roofing material had a qualitative defect that failed to meet consumer's expectation that it be fit for ordinary use);

*Lake & Piepkow Farms v. Purina Mills, Inc.*, 955 F. Supp. 791, 794 (W.D. Mich. 1997) (custom cattle feed mix harmed cattle; held: damages to cattle were economic losses recoverable exclusively under UCC based upon sophistication of parties, their reasonable expectations, and 30-year history of transactions);

*Agristor Leasing v. Guggisberg*, 617 F. Supp. 902, 908 (D. Minn. 1985) (defective animal feed storage system caused harm to feed stored therein and to cattle; held: damages to feed and cattle were losses not recoverable in tort based upon risk of harm and commercial expectation principles);

*American Xyrofin, Inc. v. Allis-Chalmers Corp.*, 230 Ill. App. 3d 662, 595 N.E.2d 650, 656, 172 Ill. Dec. 289 (1992) (blade failure in centrifugal compressor unit caused damage to product itself and surrounding premises; after discussing risk of harm factors, held: "absent additional factual circumstances sufficient to implicate legitimate safety/insurance concerns, the sole existence of damage to other property, in and of itself, is insufficient to allow recovery in tort");

*Citizens Ins. Co. v. Osmose Wood Preserving, Inc.*, 231 Mich. App. 40, 585 N.W.2d 314, 316 (1998) (restaurant's roof collapsed because of deterioration of roofing materials adversely affected by flame-retardant chemicals; held: economic loss doctrine applied even though plaintiff sought to recover for other property);

*Hapka v. Paquin Farms*, 458 N.W.2d 683, 688 (Minn. 1990) (diseased seed potatoes infected seed potato crop with ring rot; held: in a *commercial* transaction involving property damage only, the UCC provides exclusive remedy; but, in ordinary consumer transaction, full panoply of liability theories should be available, whether or not personal injury accompanies property damage, because ordinary consumer has neither skill nor bargaining power to negotiate either warranties or remedies.

The courts in a minority of jurisdictions apply a bright-line rule allowing tort recovery for harm to "other property" without considering the risks posed by the

identified harm was foreseeable or resulted from the product's failure to meet the consumers expectations; (2) whether the harm originated in a "commercial" context as opposed to a transaction with an ordinary consumer; (3) the nature of the product's use; and (4) the sophistication and relative bargaining power of the parties. *See Redman v. John D. Brush & Co.*, 111 F.3d 1174 (4th Cir. 1997); *Dakota Gasification Co. v. Pascoe Bldg. Sys.*, 91 F.3d 1094, 1099 (8th Cir. 1996); *Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 242 (6th Cir. 1994); *Chicago Heights Venture v. Dynamit Nobel of Am., Inc.*, 782 F.2d 723, 728-29 (7th Cir. 1986); *Hapka v. Paquin Farms*, 458 N.W.2d 683, 688 (Minn. 1990).

Accordingly, we affirm the trial court's dismissal of all claims.

---

product's defect, the manner in which the injury occurred, or the commercial expectations of the parties.

*Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 877-78, 117 S. Ct. 1783, 138 L. Ed. 2d 76 (1997) (fishing vessel caught fire and sank due to defectively designed hydraulic system; held: miscellaneous equipment added to vessel after its purchase constituted "other property" recoverable in tort under *East River* doctrine, which precludes admiralty tort plaintiff from recovering in tort for damage a defective product causes to itself but permits recovery for damage product causes to other property);

*Rodman Indus., Inc. v. G&S Mill, Inc.*, 145 F.3d 940, 943, 945 (7th Cir. 1998) (retrofitted boiler caused harm to new components as well as original boiler; stated: economic loss does not "encompass damages based on personal injury or damage to property other than the purchased product itself," but found that "no harm actually befell" the purchaser's other property—i.e. the original boiler);

*2-J Corp. v. Tice*, 126 F.3d 539, 544 (3d Cir. 1997) (preengineered warehouse collapsed and caused damage to warehouse's contents; without applying a risk of harm analysis or commercial expectation test; held: purchaser can recover in tort for loss of its inventory and other property stored in warehouse);

*A.J. Decoster Co. v. Westinghouse Elec. Corp.*, 333 Md. 245, 634 A.2d 1330, 1334 (1994) (ventilation system in commercial chicken and egg producer's facility failed causing loss of 140,000 chickens, held: claim for chickens was not an economic loss but rather a claim entirely for loss of property, and thus recoverable in tort).