**EAST MISSISSIPPI ELECTRIC POWER ASSOCIATION, et al., Plaintiffs,**

v.

**PORCELAIN PRODUCTS COMPANY (INC.), et al., Defendants.**

Civ. A. No. E88–0028(L).

United States District Court, S.D. Mississippi, E.D.

Jan. 10, 1990.

---

James N. Compton, Reilly Morse, Compton, Crowell & Hewitt, Biloxi, Miss., for plaintiffs.

Kenneth Watts, Eppes, Watts & Shannon, Meridian, Miss., for Porcelain Prod.

David Williams, Williams, Glover, Walton & McAlilly, Meridian, Miss., for Ideal Basic Industries, Inc.

William Walder Jacobs, Richard Joseph Bedell, Jr. and Jeffrey D. Ubersax; Robert R. Weller, James A. Klenkar, Barry L. Springel, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendants, Porcelain Products Company (Inc.), Knox Porcelain Corporation and Ideal Basic Industries, for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs have responded to the motion, and the court has considered the memoranda of authorities together with attachments submitted by the parties.

Plaintiffs are ten electric power associations whose business is the providing of electricity to their customers in Mississippi.[1] To that end, plaintiffs have constructed and maintained power lines to transmit and distribute electric power. From approximately 1975 through 1987, each of the plaintiffs purchased and installed throughout its distribution system model 2027–S porcelain insulators manufactured by Knox Porcelain Corporation. The insulators, made of two pieces of non-conductive por-

---

1. Plaintiffs are East Mississippi Electric Power Association, Dixie Electric Power Association, North Central Mississippi Electric Power Association, North East Mississippi Electric Power Association, Pearl River Valley Electric Power Association, Singing River Electric Power Associa-

tion, Southern Pine Electric Power Association, Tallahatchie Valley Electric Power Association, Yazoo Valley Electric Power Association, Coast Electric Power Association and Central Electric Power Association.

celain joined together with a cement paste, serve to support and insulate high-voltage electrical lines. According to plaintiffs, they became aware in 1987 that a substantial number of the insulators had developed cracks or fractures after being placed into service with the result that the insulators were not capable of providing the required mechanical support and insulating strength to the high voltage lines. The lines, therefore, were subject to sagging close to the ground and potentially becoming loose and falling to the ground. Thus, concluding that the defect in the insulators posed a serious safety hazard, those plaintiffs with the resources set about the task of removing all 2027–S insulators from their systems. Those without the resources necessary for so large an undertaking have let the defective insulators remain and, for the present time at least, simply "live with" the dangers they pose.

Plaintiffs brought this product liability action against the manufacturer of the allegedly defective insulators, Knox Porcelain, and its parent company, Porcelain Products, and against the manufacturer of the cement used in the insulators, Ideal, asserting claims for breach of warranty, strict liability and negligence, and seeking to recover damages for the following:

A. The purchase price of the insulators;

B. Repairs to the distribution systems;

C. Costs of replacement insulators;

D. Costs of removal of the subject insulators and replacement with non-defective insulators;

E. Costs of equipment required for removal and replacement;

F. Loss of goodwill;

G. Transportation and storage costs of the subject insulators;

H. Costs of inspection and testing of insulators;

I. Costs and expenses for and related to damages and injuries to plaintiffs, other persons, and property caused by failure of the subject insulators;[2]

J. Costs, expenses and other damages from delays in expansion and upgrade of existing systems;

K. Attorneys' fees and costs incurred in regard to claims by others against plaintiffs as a result of damages and injuries caused by the subject insulators.

As demonstrated by the itemization of damages for which recovery is sought, plaintiffs seek primarily to recover any and all costs associated with locating, removing and replacing the 2027–S insulators on their lines. Defendants have moved for summary judgment as to those counts of the complaint asserting strict liability and negligence as bases for recovery. According to defendants, the Uniform Commercial Code, as adopted by the Mississippi legislature, is the exclusive source of plaintiffs' rights of recovery. Their motion presents to the court an issue heretofore unencountered and hence unaddressed by the Mississippi Supreme Court, to-wit, whether there may be recovery in strict liability or negligence for a product defect where that defect results in damage only to the product itself and thus causes only economic loss to its purchaser. Having thoroughly considered the memoranda of authorities submitted by the parties, the court is of the opinion that the Mississippi Supreme Court would deny recovery under those tort theories in the circumstances presented.

The overwhelming majority of courts that have confronted the issue have concluded that a plaintiff who suffers only economic loss as the result of a defective product may have no recovery in strict liability or negligence, though such damages may be pursued under a breach of warranty theory of liability. This view was first espoused in *Seely v. White Motor Co.*, 63 Cal.2d 9, 403 P.2d 145, 45 Cal.Rptr. 17 (1965), in which the court explained:

The law of sales has been carefully articulated to govern the economic relations between suppliers and consumers of goods. The history of the doctrine of strict liability in tort indicates that it was designed, not to undermine the warranty provisions of the sales act or the Uniform Commercial Code but, rather, to

---

**2.** The specific incidents underlying this item of damage will be discussed *infra*.

govern the distinct problem of physical injuries.

.    .    .    .    .

The distinction the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm.... A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.... The Restatement of Torts similarly limits strict liability to physical harm to person or property.

*Seely,* 403 P.2d at 149–51, 45 Cal.Rptr. at 21–23.[3] *See Jones & Laughlin Steel Corp. v. Johns–Manville Sales Corp.,* 626 F.2d 280, 287 n. 13 (3d Cir.1980) (citing cases adopting *Seely* position); *see also* W. Prosser and W. Keeton, *The Law of Torts* § 95 at 680 (Uniform Commercial Code generally regarded as exclusive source for ascertaining seller's liability for damages in claim based on economic loss not attributable to physical injury to persons or property).

A few jurisdictions have supported the view that a manufacturer's breach of its duty to make nondefective products subjects it to liability for injury to the product itself, and thus permits strict liability recovery where the sole alleged damages are economic. This position, which originated in *Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965), while not entirely without adherents, is by far the minority approach to this issue. A third view, and the one contended for by plaintiffs, would permit a tort claim in some circumstances where the resulting loss is purely economic, depending on the nature of the defect, the type of risk and the manner in which the harm arose. Jurisdictions adopting this view engage in a "risk of harm" analysis with an eye toward permitting recovery in tort for product users who are "endangered" rather than merely "disappointed."

> Under this analysis the fact that a hazardous product defect has injured only the product itself, and not persons or other property, is properly regarded as a "pure fortuity." ... Thus the same remedy is made available for this sort of injury as would be available if the product had injured something or someone else.

*Washington Water Power Co. v. Graybar Elec. Co.,* 112 Wash.2d 847, 774 P.2d 1199, 1210 (1989) (citations omitted). Plaintiffs argue that the allegedly defective insulators at issue in this case, because of their function, have rendered plaintiffs' entire electric power distribution systems unreasonably dangerous and that therefore, under the "risk of harm" analysis, they have stated a viable claim for recovery in strict liability and negligence. The court, though, finds it unlikely that the Mississippi Supreme Court would decide to join the "steadily dwindling minority of jurisdictions that permit tort-based actions for economic loss." *Id.* 774 P.2d at 1205 n. 7.

In a 1986 admiralty decision, the United States Supreme Court unanimously embraced and adopted the majority rule of *Seely,* holding that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liabili-

---

**3.** Section 402A of the Restatement (Second) of Torts, which has been adopted in Mississippi, provides in pertinent part that "one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability *for physical harm thereby caused to the ultimate user or consumer or his property* ..." (emphasis added).

ty theory to prevent a product from injuring itself," *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865 (1986), and thus, no products-liability claim for negligence or strict liability lies "when the only injury claimed is economic loss," *id.* at 876, 106 S.Ct. at 2304. The Court reasoned that:

> The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the "cost of an injury and the loss of time or health may be an overwhelming misfortune," and one the person is not prepared to meet.... In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service.
>
> .    .    .    .    .
>
> Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received "insufficient product value."   ... The maintenance of product value and quality is precisely the purpose of express and implied warranties.... Therefore, a claim of nonworking product can be brought as a breach of warranty action.

**4.** Plaintiffs challenge the Court's "disregard" for safety concerns inherent in its statement that product injuries do not raise safety concerns. According to plaintiffs' analysis, the same safety concerns are present regardless of whether the product injures only itself or causes personal property or other product injury since it is a mere fortuity that the product has done no further damage. It is manifest, however, that a product which injures only itself is subject to replacement by the purchaser before it causes any further damage. The cost of such replacement is included within the remedies provided by the Uniform Commercial Code and hence falls within the breach of warranty remedies. If that remedy is unavailable in a particular case, that is because the commercial purchaser has failed to secure a warranty remedy in its contract with the product seller. That failure is not due to any omission in the law but rather the purchaser's own omission, and to allow re-

*East River*, 476 U.S. at 871–72, 106 S.Ct. at 2302–03 (citations omitted).[4]

The Court specifically rejected what it termed the "intermediate" approach contended for in this case by plaintiffs, explaining that in its view:

> The intermediate positions, which essentially turn on the degree of risk, are too indeterminate to enable manufacturers easily to structure their business behavior.... We realize that the damage may be qualitative, occurring through gradual deterioration or internal breakage. Or it may be calamitous.... But either way, since by definition no person or other property is damaged, the resulting loss is purely economic. Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law.

*Id.* at 870, 106 S.Ct. at 2302 (citations omitted).[5]

Particularly after the *East River* decision, and its suggestion that if strict liability and negligence theories of product defect recovery "were allowed to progress too far, contract law would drown in a sea of tort," *id.* at 866, 106 S.C.t at 2300, courts began to retreat even further from the previously described minority position and

covery where the parties' contract precludes it would be to allow the purchaser to circumvent the law governing the parties' contract altogether. This is an unacceptable result.

Of course, if the purchaser does not discover the defect before the product does damage beyond the product itself, then a tort remedy becomes available, not because of the nature of the defect but rather because of the nature of the injury caused by the defect.

**5.** Most of the courts adhering to the risk of harm approach had focused on the manner in which an injury occurred, allowing recovery in tort only for harm resulting from a sudden and calamitous event as contrasted with a gradual deterioration. Plaintiffs here apparently recognize that the harm or damage they have sustained has not been caused by any abrupt, accident-like event and thus they have placed little emphasis on this factor.

the risk of harm view.[6] Indeed, the case credited with developing the risk of harm approach, *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165 (3d Cir.1981), was effectively overruled by the Third Circuit in a decision rendered after *East River*. In *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110 (3d Cir.1987), the court, impressed with the "cogent reasoning" and "persuasive analysis" in the opinion of the Court in *East River*, concluded that the *Pennsylvania Glass* decision should and would be rejected by the courts of Pennsylvania. This court is likewise persuaded that the Mississippi courts would embrace the rule of no recovery in tort for economic damages.

The case presented by plaintiffs is essentially a commercial dispute in which plaintiffs' ultimate complaint is that the insulators have not performed as expected. Allowing recovery in tort under these circumstances would not further the purpose of strict liability, a doctrine which was developed "to ensure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market, rather than by the injured persons who are powerless to protect themselves." *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 377 P.2d 897, 901, 27 Cal.Rptr. 697, 701 (1963) (cited in *Seely*). In *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660 (1985), the court explained as follows:

> Strict liability evolved as a judicial response to inadequacies in sales law with respect to consumers who sustained physical injuries from defective goods

made or distributed by remote parties in the marketing chain.

The considerations that give rise to strict liability do not obtain between commercial parties with comparable bargaining power.

*Spring Motors*, 489 A.2d at 670–71. This court concurs in the rationale expressed in the cases following *Seely* and concludes that to permit plaintiffs here to assert tort claims would undermine the warranty remedies provided by the Mississippi Commercial Code and unacceptably broaden the manufacturer's exposure to damages. Plaintiffs' claim that the insulators have cracked and must be replaced is simply not a claim for the kind of accidental physical injury against which tort law was designed to protect consumers. In contrast, this is a commercial dispute in which commercial purchasers complain that a product has not functioned as was expected and intended. As the Court aptly observed in *East River*,

> Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, or by disclaiming or limiting remedies.... In exchange, the purchaser pays less for the product. Since a commercial situation does not involve large disparities in bargaining power, ... we see no reason to intrude into the parties' allocation of the risk.

*East River*, 476 U.S. at 873, 106 S.Ct. at 2303.[7]

---

**6.** Only one of the cases relied on by plaintiffs in support of their quest for a ruling that would allow recovery in tort for economic damages was decided after *East River*. And, it is quite likely that the remainder of those cases would be decided differently today.

Additionally, plaintiffs rely on a number of cases applying a "risk of harm" type analysis to the contamination of buildings by asbestos insulation. The court, though, views the asbestos cases in an entirely different light than the case here presented. The asbestos cases, unlike this one, present a situation in which the product contaminates the buildings in which it is installed and hence causes harm to more than simply the product itself. Indeed, in asbestos cases,

one could conclude that there was no damage to the product itself, which performed satisfactorily, but that the sole harm was to other property and persons. That certainly is not the case here where the only harm is to the product itself which has not performed as expected.

**7.** Plaintiffs appear to suggest in their brief that because defendants have raised defenses to plaintiffs' warranty claims and there thus exists the possibility that they may be precluded from recovery under warranty, the court should not dismiss their tort claims. In this respect, the court would note that the viability of the warranty counts is not an issue presently before the court. But even if the court had been presented

Plaintiffs suggest that even if this court, through its *Erie*-prediction, were to place Mississippi with those jurisdictions adopting the *Seely* approach, plaintiffs could nevertheless recover in strict liability and negligence under the facts presented since the damage caused by the defective insulators is not confined solely to the insulators. In other words, they maintain that defendants are mistaken in their claim that only the product itself has been damaged. In support of this position, plaintiffs reason that there has been injury to plaintiffs' property even when a specific insulator has not yet directly caused damage because plaintiffs' systems as a whole have been made unsafe by the defective insulators the systems contain. They assert specifically that their electric distribution systems have been damaged and their value diminished as a result of the damage posed by the 2027–S insulators, the nature of such damages being the removal and replacement costs of all such insulators in order to remove the safety hazard which they pose. It is clear from plaintiffs' own arguments, though, that all of the damages suffered are economic and the only property damaged in their systems is the insulators themselves. Indeed, that the only actual physical damage is confined to the insulators is made abundantly clear by plaintiffs' own assertion that once the insulators are removed and replaced, the systems will be safe. Moreover, the alleged damage to the systems is described by plaintiffs in terms of the diminished value of the system and the cost of removal and replacement of the insulators; the damages are thus solely of an economic nature.

Plaintiffs also urge that they have sustained both property damage and personal injury as a result of incidents involving defective insulators and thus the *Seely* rule has no application here. Plaintiffs cite, in particular, a 1987 incident in which an employee of Dixie Electric, while climbing a power pole to hang a transformer, was struck in the arm when the power line which had been supported by a 2027–S insulator came loose and dropped. For the burn to his arm and an injury to his knee upon falling to the ground, the employee received worker's compensation benefits. In a similar incident, an employee of Yazoo Electric was injured while replacing a cracked insulator for which the power association paid approximately $200 for his medical treatment. On another occasion, a log truck, while being driven down a Clarke County highway, struck a sagging power line causing approximately $1500 in damages to the truck; those damages were paid by East Mississippi Electric Power. Finally, a power line which had been supported by a 2027–S insulator fell, came into contact with the pole and caused sparks which resulted in a small fire on the ground. In at least the first three incidents described, there was injury to person or property other than just the insulators. However, that damage was not sustained by the plaintiff power associations but rather by third persons. To the extent that a plaintiff was required to pay out monies to third parties who were injured, they suffered loss, but only economic loss.[8] *See, e.g., Plainwell Paper Co., Inc. v. Pram, Inc.,* 430 F.Supp. 1386, 1387 (W.D. Pa.1977) (including settlement of claims arising out of defective materials in list of purely economic harms).[9]

Based on the foregoing, it is ordered that defendants' motion for partial summary judgment is granted and those counts of the complaint charging liability in strict

that issue and had made a determination that the warranty claims were indeed ineffective, the court would not be persuaded that tort recovery should be made available. That is because regardless of any protection plaintiffs may or may not have contracted for, the law of warranty is sufficient to protect commercial purchasers.

8. The court would note that only three of the ten plaintiffs have been required to expend money to compensate third parties for personal injury or property damage.

9. Notably, the Mississippi Commercial Code provides for payment of consequential damages, expressly including damages for "injury to person or property proximately resulting from any breach of warranty." Miss.Code Ann § 75–2–715(2).

 

liability and negligence are ordered dismissed from the complaint.

SO ORDERED.