IN THE SUPREME COURT OF MISSISSIPPI
NO. 2023-CA-01208-SCT

*SUNSHINE MILLS, INC.*

*v.*

*NUTRA-BLEND, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/12/2023 |
| TRIAL JUDGE: | HON. JOHN R. WHITE |
| TRIAL COURT ATTORNEYS: | CHRISTOPHER BAXTER DRIVER |
| | SAMUEL DAVID KNIGHT |
| | JONATHAN C.  MIESEN |
| | ANNA LITTLE MORRIS |
| | FRED EXZELL BOURN, III |
| | WILLIAM LISTON, III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | SAMUEL DAVID KNIGHT |
| | CHRISTOPHER BAXTER DRIVER |
| ATTORNEYS FOR APPELLEE: | FRED EXZELL BOURN, III |
| | ANNA LITTLE MORRIS |
| | JONATHAN C. MIESEN |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND REMANDED - 09/04/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**COLEMAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The Mississippi Products Liability Act requires proof of damage caused by a defective product.  The claims before us, both sounding in contract, do not allege damage stemming from a defective product.  Therefore, the Mississippi Products Liability Act does not govern. We reverse and remand the trial court's grant of summary judgment on Sunshine Mills' claims of breach of contract and implied warranty.

## FACTS

¶2.   Sunshine Mills is a pet food manufacturer and distributer operating a manufacturing facility in Tupelo, Mississippi.  For many years, Sunshine Mills conducted business with Nutra-Blend, a manufacturer and distributer of animal nutrient products;  Sunshine Mills purchased various premixes and vitamins from Nutra-Blend.  In 2009, a Sunshine Mills representative reached out to Nutra-Blend's former Director of Nutrition and Quality Control inquiring how much Vitamin D3 would be needed to achieve its desired potency in one of its dog food products.  After discussing the particulars, Nutra-Blend's former director provided what he called his solution to Sunshine Mills' particular need and recommended adding a certain amount of Nutra-Blend's Vitamin D3 7500 product.

¶3.   Sunshine Mills subsequently placed a total of fourteen orders for Vitamin D3 7500 from April 2009 to October 2017.  Sunshine Mills typically ordered the product via telephone or Nutra-Blend's online ordering system.  In October 2017, however, Sunshine Mills opted to use email instead; Sunshine Mills' purchasing representative sent an email to Nutra-Blend's sales representative requesting an order of "Vitamin D-3."  Nutra-Blend purported that because almost all of its orders are for Vitamin D3 500, as opposed to Sunshine Mills' usual order of Vitamin D3 7500, it assumed the purchase was for Vitamin D3 500.  Nutra-Blend's sales representative responded that it would be able to send twenty bags of "D3-500."  Sunshine Mills believed Nutra-Blend only sold one Vitamin D3 product and, not noticing the title discrepancy, confirmed the purchase.

¶4.     When delivered, the bill of lading described the product as Vitamin D3 500. Nutra-Blend characterized Vitamin D3 7500 and 500 as drastically different in appearance and price. Sunshine Mills receives thousands of other products that frequently change in package appearance, so Sunshine Mills nevertheless accepted the delivery, approved and paid the invoice, and placed three more orders for the wrong concentration of Vitamin D3. Sunshine Mills was not alerted to the product's different trade name as it was only aware of one Vitamin D3 product sold by Nutra-Blend, the one it purchased without issue for fourteen years. The Vitamin D3 orders were accepted, paid for, and mixed in the dog food. Vitamin D3 500 is vastly more concentrated than D3 7500, and as a result, several dogs developed Vitamin D toxicity, became sick, and, in some cases, died.

¶5.     Sunshine Mills filed a complaint against Nutra-Blend and presented four separate grounds for relief: breach of contract, breach of implied warranty, a claim grounded in the Mississippi Products Liability Act, and common-law negligence. Nutra-Blend filed a motion for summary judgment and asserted that each of Sunshine Mills' claims were subsumed by the Mississippi Products Liability Act but nevertheless failed on other grounds. In response to Nutra-Blend's motion for summary judgment, Sunshine Mills abandoned its tort-based claims sounding in products liability and common-law negligence, retaining only its contract claims.

¶6.     The trial court found no genuine issues of material fact as to any of Sunshine Mills' claims and granted Nutra-Blend's motion for summary judgment. Sunshine Mills filed the

present appeal. Excluding the abandoned claims, Sunshine Mills' remaining claims before us on appeal are not subsumed by the Mississippi Products Liability Act, and there are genuine issues of material fact on each. Therefore, we reverse and remand as to Sunshine Mills' contract claims.

## DISCUSSION

### I. Sunshine Mills' claims are not subsumed by the Mississippi Products Liability Act.

¶7. Nutra-Blend's primary argument is that Sunshine Mills' claims fail as a matter of law because they are subsumed by the Mississippi Products Liability Act. Sunshine Mills contends that Mississippi Code Section 11-1-63 does not address its claims for breach of implied warranty and breach of contract. Nutra-Blend argues that, based on its plain language, the Mississippi Products Liability Act subsumes all claims for damages caused by a product asserted against the seller, manufacturer, or distributor of that product. The Products Liability Act indeed casts a wide net but not so wide as to preclude every claim in which a product plays a role.

¶8. Section 11-1-63 provides, in pertinent part, as follows:

> Subject to the provisions of Section 11-1-64, in any action for damages caused by a product, including, but not limited to, any action based on a theory of strict liability in tort, negligence or breach of implied warranty, except for commercial damage to the product itself:
>
> (a) The manufacturer, designer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer, designer or seller:

4

(i) 1. The product was *defective* because it deviated in a material way from the manufacturer's or designer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or

2. The product was *defective* because it failed to contain adequate warnings or instructions, or

3. The product was designed in a *defective* manner, or

4. The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and

(ii) The *defective* condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The *defective* and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

(b) A product is not *defective* in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

(c)(i) In any action alleging that a product is *defective* because it failed to contain adequate warnings or instructions pursuant to paragraph (a)(i)2 of this section, the manufacturer, designer or seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer, designer or seller, the manufacturer, designer or seller knew or in light

5

of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition.

. . . .

(d)     In any action alleging that a product is *defective* pursuant to paragraph (a) of this section, the manufacturer, designer or seller shall not be liable if . . . .

(e)     In any action alleging that a product is *defective* pursuant to paragraph (a)(i)2 of this section . . . .

(f)     In any action alleging that a product is *defective* because of its design pursuant to paragraph (a)(i)3 of this section . . . .

. . . .

(g)     The manufacturer of a product who is found liable for a defective product pursuant to paragraph (a) shall indemnify a product seller or designer

. . . .

(h)     In any action alleging that a product is *defective* pursuant to paragraph (a) of this section . . . .

Miss. Code Ann. § 11-1-63 (Rev. 2019) (emphasis added).

¶9.     "The interpretation of a statute is a question of law, and the standard of review on appeal is de novo." *Dancy v. State*, 287 So. 3d 931, 935-36 (¶ 14) (Miss. 2020) (internal quotation marks omitted) (quoting *Rex Distrib. Co., Inc. v. Anheuser-Busch, LLC*, 271 So. 3d 445, 449 (Miss. 2019)). The primary goal of statutory interpretation is legislative intent, and we look to the language of the statute to achieve it. *Hall v. State*, 241 So. 3d 629, 631 (¶ 5) (Miss. 2018) (quoting *Legislature v. Shipman*, 170 So. 3d 1211, 1215 (¶ 14) (Miss.

2015)).

¶10.    Nutra-Blend focuses on the first sentence of the statute to the exclusion of the remainder and, as a result, gives far too broad an effect to it.  Its reading of "damages caused by a product" as encompassing all harm traceable to a product, regardless of legal theory, is at odds with the structure of Section 11-1-63, which delineates specific types of product defects (design, manufacturing, failure to warn, and breach of express warranty) and requires that the plaintiff prove the product was both defective and unreasonably dangerous. § 11-1-63(a)(i)-(iii).

> A negligence claim alleging failure to warn, train, educate, or draft a warning plan about the dangers of odorant fade and the need for gas detectors indeed is a claim *based upon products liability*, and such a claim must be analyzed under the MPLA.  If the plaintiffs in this case had alleged negligence claims against the manufacturer and seller that were unrelated to the odorant's alleged defects—for instance, fraud, misrepresentation, or breach of the implied warranty of merchantability—then the MPLA would not have applied and common-law principles would have controlled.  But all of Plaintiffs' negligence or strict-liability claims *are based on the damages purportedly caused by alleged defects* in the odorant, so we must analyze those claims under the MPLA.

*Elliot v. El Paso Corp.*, 181 So. 3d 263, 269 (¶ 19) (Miss. 2015) (second emphasis added) (footnotes omitted) (citations omitted).

¶11.    "Our duty is to carefully review statutory language and apply its most reasonable interpretation and meaning to the facts of a particular case." *Pope v. Brock*, 912 So. 2d 935, 937 (¶ 8) (Miss. 2005).  Nutra-Blend's interpretation, that the Products Liability Act subsumes all claims for damages caused by a product, is unreasonable.  We clarify today that

the Products Liability Act governs claims for damages caused by defective products.

### A. Breach of Contract Claim

¶12. Turning to the specific claims before us, Nutra-Blend cannot cite any authority for its proposition that breach of contract claims are subsumed into the Products Liability Act. We have never before so held, and we decline to do so today. Sunshine Mills purports that its breach of contract claim stems from delivery of the wrong product not that the product was inherently dangerous or defective, so the Products Liability Act does not govern. Our Court has acknowledged "that the MPLA is the exclusive remedy for [product liability] claims" but that exclusivity pertains to tort-based theories—not to contract breaches between sophisticated commercial entities. *Elliot*, 181 So. 3d at 269 (¶ 17) (citing *Lawson v. Honeywell Int'l., Inc.*, 75 So. 3d 1024, 1027 (Miss. 2011)). Nutra-Blend's cited authority all pertains to claims for defective products, yet Sunshine Mills alleges only that the product was unsuitable for the use contemplated and supplied without adequate communication. That is not a tort. It is a breach of contractual obligation.

¶13. A claim for breach of contract, by its very nature, is not a claim for damages caused by a product. "Under Mississippi law, a plaintiff asserting any breach-of-contract claim has the burden to prove by a preponderance of the evidence (1) that a valid and binding contract exists; and (2) that the defendant has broken or breached it without regard to the remedy sought or the actual damage sustained." *White v. Jernigan Copeland Att'ys, PLLC*, 346 So. 3d 887, 896 (¶ 17) (Miss. 2022) (internal quotation marks omitted) (quoting *Norman v.*

8

*Anderson Reg'l Med. Ctr.*, 262 So. 3d 520, 527 (Miss. 2019)). The remedy for a breach of contract is to put the nonbreaching party in the same position as that party would be in had the contract been performed. *Healy v. AT&T Servs., Inc.*, 362 So. 3d 14, 18 (¶13) (quoting *Theobald v. Nosser*, 752 So. 2d 1036, 1042 (Miss. 1999)). In other words, in a contract for the sale and purchase of goods, any damages for breach of the contract are caused by the breach itself rather than the products being bought and sold. The breach is caused by the actions of the breaching party rather than a product.

¶14. There is a fundamental difference between, *e.g.*, personal injury and death caused by the tread separating on a defective tire that results in a roll-over accident on the one hand, *Cooper Tire & Rubber Co. v. Tuckier*, 826 So. 2d 679 (Miss. 2002), and the damages caused by one party breaching a sales contract when it allegedly breaches the contract by providing the wrong or an inadequate product. As discussed above, the former sounds in tort, and the latter sounds in contract law. Accordingly, we hold that Sunshine Mills' claim sounding in breach of contract is not subsumed by the Products Liability Act.

B.     *Breach of Implied Warranty Claim*

¶15. While Section 11-1-63 explicitly includes in its nonexhaustive list of subsumed claims a claim for breach of implied warranty, claims for "commercial damage to the product itself" are expressly excluded from the Act. § 11-1-63. Sunshine Mills suggests the Act's language, "included, but not limited to, any action based on a theory of strict liability in tort, negligence or breach of implied warranty" merely modifies "any action for damages caused

9

by a product[.]" § 11-6-63. Sunshine Mills insists its claim for breach of implied warranty falls within the excluded category because its damages are commercial in nature, *e.g.*, the cost of recalling the defective product.

¶16. The phrase "commercial damage to the product itself" is rooted in what is known as the economic loss doctrine. The Mississippi Supreme Court has never addressed it. Our Court of Appeals has published two opinions that mention it. ***Ill. Cent. R. R. Co. v. J.F. (In re Adoption of D.C.S., Jr.)***, 44 So. 3d 1006, 1019 (¶ 54) (Miss. Ct. App. 2009) (Griffis, J., dissenting); ***State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.***, 736 So. 2d 384, 386-388 (¶¶ 9-16) (Miss. Ct. App. 1999).

¶17. As the Court of Appeals noted in ***State Farm***, 736 So. 2d at 386-88 (¶¶ 9-16), the United States District Court for the Southern District of Mississippi has entered an ***Erie*** guess regarding how Mississippi law would treat it in ***East Mississippi Electric Power Ass'n v. Porcelain Products Co.***, 729 F. Supp. 512 (S.D. Miss. 1990). There, the district court, making a guess pursuant to ***Erie Railroad Co. v. Tompkins***, 304 U.S. 64 (1938), as to whether or not the Mississippi Supreme Court would recognize the economic loss doctrine wrote:

> The overwhelming majority of courts that have confronted the issue have concluded that a plaintiff who suffers only economic loss as the result of a defective product may have no recovery in strict liability or negligence, though such damages may be pursued under a breach of warranty theory of liability.

***E. Miss. Elec. Power Ass'n***, 729 F. Supp at 514. The court went on as follows:

> The law of sales has been carefully articulated to govern the economic

10

relations between suppliers and consumers of goods. The history of the doctrine of strict liability in tort indicates that it was designed, not to undermine the warranty provisions of the sales act or the Uniform Commercial Code but, rather, to govern the distinct problem of physical injuries.

. . . .

The distinction the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. . . . A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone. . . . The Restatement of Torts similarly limits strict liability to physical harm to person or property.

*Id.* at 514-15 (quoting *Seely v. White Motor Co.*, 403 P.2d 145, 151 (1965)). To the current day, we have never announced whether Mississippi would adopt the economic loss doctrine. For the purposes of today's case, however, it does not directly affect the outcome because Sunshine Mills abandoned its claims sounding in strict liability.

¶18. The doctrine does, however, shed light on what is meant by the language "except for commercial damage to the product itself" found in the first sentence of Section 11-1-63. In the post-2014 amendment case of *Elliot*, we noted: "The MPLA provides the exclusive remedy 'in any action for damages caused by a product' against a product manufacturer or seller." *Elliot*, 181 So. 3d at 270 (¶ 26) (citing § 11-1-63(a); *Lawson*, 75 So. 3d at 1029).

11

The Products Liability Act functions to replace *common-law* claims for damages caused by defective products against manufacturers and sellers, but it does *not* subsume common-law claims against nonsellers and nonmanufacturers. *Lawson*, 75 So. 3d at 1029-30 (¶ 16).

¶19.    Again, the economic loss doctrine dictates that a plaintiff may not recover purely economic losses based on theories of negligence or strict liability. The Products Liability Act mandates that all common-law claims for damages caused by defective products made against a manufacturer, designer, or seller of a product be brought according to its provisions. Therefore, the language "except for commercial damages to the product itself" is best read in conjunction with the economic loss doctrine as precluding actions for purely economic damages to "the product itself" from the Products Liability Act.

¶20.    In *State Farm*, the Court of Appeals wrote, "presumably the language means that damages caused by the product that adversely affect the product's monetary value are not within the scope of the act's coverage, and thus, the product owner would have to seek a remedy in the law of warranty or contract." *State Farm*, 736 So. 2d at 388 (¶ 14) (citing Phillip L. McIntosh, *Tort Reform in Mississippi: An Appraisal of the New Law of Products Liability, Part I*, 16 Miss. C.L. Rev. 393, 423 n.277 (1996)). We agree with the Court of Appeals. Sunshine Mills seeks damages for its recall expenses, product refunds, freight expenses, product testing expenses, and product destruction expenses, etc., relating to the dog food's monetary value, which it asserts are "not damages caused by a product under the MPLA." *See Brasscorp v. Highside Chems., Inc.*, No. 1:02CV84 2007 WL 1673539, at *2

12

(S.D. Miss. June 7, 2007). Thus, in addition to not resting on proof that the product was defective, Sunshine Mills' claim for breach of implied warranty is not precluded because it seeks damages outside the Act's scope.

¶21. We note that Nutra-Blend also argued that Sunshine Mills' claims fail under the "innocent seller" provision of the Products Liability Act. Sunshine Mills argues the provision is inapplicable. The Products Liability Act describes the innocent seller defense as follows:

> *In any action alleging that a product is defective* pursuant to paragraph (a) of this section, the seller or designer of a product rather than the manufacturer shall not be liable unless the seller or designer exercised substantial control over that aspect of the design, testing, manufacture, packaging or labeling of the product that cause the harm for which recovery of damages is sought; or the seller or designer altered or modified the product, and the alteration or modification was a substantial factor in causing the harm for which recovery of damages is sought; or the seller or designer had actual or constructive knowledge of the defective condition of the product at the time he supplied the product. It is the intent of this section to immunize innocent sellers who are not actively negligent, but instead are mere conduits of a product.

Miss. Code Ann. § 11-1-63(h) (Rev. 2019) (emphasis added).

¶22. The innocent seller provision is a defense under the Products Liability Act, but, as we have said, neither of Sunshine Mills' claims seek damages based on a defective product, a requisite of the Act. Therefore, since the Products Liability Act does not apply to Sunshine Mills' claims, Nutra-Blend cannot avail itself of the Act's defenses.

## II. Sunshine Mills sufficiently established the essential elements of its claims.

¶23. Having determined that the Products Liability Act does not bar Sunshine Mills' claims, we now consider whether Sunshine Mills established the essential elements of its

13

breach of contract and implied warranty claims. Viewing the evidence in the light most favorable to Sunshine Mills, we hold that Sunshine Mills sufficiently established its claims and that genuine issues of material fact preclude summary judgment.

¶24. We review the circuit court's grant of summary judgment *de novo*. ***Byram Café Grp., LLC v. Tucker***, 344 So. 3d 844, 847 (¶ 10) (Miss. 2022) (quoting ***Stribling Inv., LLC v. Mike Rozier Constr. Co.***, 189 So. 3d 1216, 1219 (Miss. 2016)). While the moving party bears

> the initial burden of *persuading* the trial judge that no issue of material fact exists and that they are entitled to summary judgment based upon the established facts, [the nonmoving] party carries the burden of *producing* sufficient evidence of the essential elements of her claim at the summary judgment stage, as she would carry the burden at trial.

***Karpinsky v. Am. Nat'l Ins. Co.***, 109 So. 3d 84, 89 (¶ 13) (Miss. 2013).

¶25. On appeal, we review the facts "in the light most favorable to the party against whom the summary judgment motion has been made[,]" and "[w]hen there is doubt whether a fact issue exists, the non-moving party is the beneficiary of that doubt." ***Simmons v. Thompson Mach. of Miss., Inc.***, 631 So. 3d 798, 802 (Miss. 1994) (citing ***Brown v. Credit Ctr, Inc.***, 444 So. 2d 358, 362 (Miss. 1983)).

### A. Breach of Contract

¶26. Sunshine Mills asserts Nutra-Blend breached the parties' contract created by their course of dealing. A valid contract requires:

> (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5)

14

mutual assent, and (6) no legal prohibition precluding contract formation. *Grenada Living Ctr., LLC v. Coleman*, 961 So. 2d 33, 36-37 (¶ 9) (Miss. 2007) (citing *Rotenberry v. Hooker*, 864 So. 2d 266, 270 (Miss. 2003)). An agreement can be inferred from parties' course of dealing. Miss. Code Ann. § 75-1-201(b)(3) (Rev. 2016). A course of dealing is "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions or other conduct." Miss. Code Ann. § 75-1-303(b) (Rev. 2016).

¶27. Sunshine Mills purported in its complaint that for almost a decade it ordered Vitamin D3 7500 based on Nutra-Blend's recommendation, which obligated Nutra-Blend to continue supplying Vitamin D3 7500. Thus, Sunshine Mills alleged Nutra-Blend breached their agreement by deviating from their prior conduct, *i.e.*, shipping Vitamin D3 500 instead of Vitamin D3 7500. Nutra-Blend agrees that it bore an obligation to Sunshine Mills but reasoned the obligation was incurred by the 2017 emails in which it stated it would be shipping Vitamin D3 500, and Sunshine Mills accepted the shipments. If and when a contract was created based on the parties' course of dealing is a factual dispute for the fact-finder's resolution.

¶28. Both parties present conflicting evidence. Sunshine Mills purports that it was unaware there was another Vitamin D3 product per Nutra-Blend's price list identifying Vitamin D3 7500 as its only Vitamin D3 product; and thus it believed the subject of the 2017

15

emails was the same and only Vitamin D3 product. Nutra-Blend, on the other hand, points to references of Vitamin D3 500 throughout the emails, invoices, bills of lading, and labels. Nevertheless, Sunshine Mills doubles down on its belief that Nutra-Blend sold only one Vitamin D3 product and considered the label "Vitamin D3 500" "an esoteric trade term" that it did not recognize as different from its usual product.

¶29. Nutra-Blend considers Sunshine Mills' apparent confusion to be subjective and thus irrelevant to the express terms of the emails. Sunshine Mills responds that its confusion precluded acceptance and thus could not have created an agreement that superseded the parties' agreement borne from their previous dealings; there could be no meeting of the minds because it was unaware of the product's existence and believed, albeit mistakenly, that it was receiving the same product as in previous transactions. At a minimum, it is clear that Nutra-Blend failed to prove a lack of factual issues. Thus, the trial court erred by granting summary judgment on Sunshine Mills' breach of contract claim.

### B.    Breach of Implied Warranty of Fitness

¶30. Nutra-Blend asserts that Sunshine Mills failed to establish each element of its claim for breach of implied warranty of fitness. For a claim of implied warranty of fitness, the claimant must establish the following:

> (1) the seller at the time of the contracting had reason to know the particular purpose for which goods were required[,] (2) the reliance by the plaintiff as buyer upon the skill or judgment of the seller to select suitable goods, and (3) the goods were unfit for the particular purpose.

***Watson Quality Ford, Inc. v. Casanova***, 999 So. 2d 830, 835 (¶ 12) (Miss. 2008) (citing

16

***Garner v. S & S Livestock Dealers, Inc.***, 248 So. 2d 783, 785 (Miss. 1971)).

¶31.    Nutra-Blend claims Sunshine Mills failed to show: (1) that Vitamin D3 7500 was for a special purpose, (2) that it relied on Nutra-Blend's judgment to provide a suitable product, and (3) that Vitamin D3 500 was unfit for the particular purpose.  We disagree with Nutra-Blend on each element and hold that Sunshine Mills sufficiently established the claim to survive a motion for summary judgment.

¶32.    Nutra-Blend purports that Vitamin D3 was not used for a particular purpose; rather, it asserts that Vitamin D3 products are standard in the pet food industry.  While pet food manufacturers may commonly use Vitamin D3, Sunshine Mills argues it did not require a standard formulation, but rather a Vitamin D3 premix of a particular concentration that could feasibly be mixed in multiple batches of a specific dog food, as evidenced by its emails seeking Nutra-Blend's recommendation.  Sunshine Mills introduced evidence that its sales representative emailed Nutra-Blend's former Director of Nutrition and Quality Control requesting a recommendation for a particular dog food that required a specific amount of Vitamin D3.  Sunshine Mills' representative described its needs, and Nutra-Blend's former director recommended the premix Vitamin D3 7500; the former director referred to the recommended premix as his solution to Sunshine Mills' specific purpose.  Thus, the emails also serve to indicate that Nutra-Blend had reason to know of Sunshine Mills' specific needs.

¶33.    Next, Nutra-Blend alleged in its motion that Sunshine Mills did not use the recommended calculation. Sunshine Mills responded with testimonial evidence to the

17

contrary, that it did use and relied upon Nutra-Blend's specific formulation for its dog food. Nutra-Blend argues that Vitamin D3 500 is used commonly used in many pet food products, so Sunshine Mills cannot establish that it was unfit for use in dog food products. The relevant inquiry in a claim for breach of the implied warranty of fitness is whether the product was unfit for the buyer's particular purpose, not whether it was unfit for its general purpose. Vitamin D3 500 may well be fit for many pet food purposes. However, it was clearly unfit for Sunshine Mills' particular purpose; Vitamin D3 500 was dangerously concentrated for Sunshine Mills' stated formulation. Sunshine Mills presented sufficient evidence on each element of its breach of implied warranty claim.

¶34. Finally, Nutra-Blend argues that Sunshine Mills cannot recover consequential damages on its implied warranty claim, and since consequential damages are the only damages it seeks, the claim fails as a matter of law. Both parties agree the damages sought are consequential. Nutra-Blend insists that Sunshine Mills cannot recover consequential damages because a simple inspection of the Vitamin D3 would have indicated it was obviously the wrong product. Nutra-Blend relies upon Mississippi Code Section 75-2-715, which defines, in pertinent part, consequential damages as those resulting from:

> (a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise[.]

Miss. Code Ann. § 75-2-715(2)(a) (Rev. 2016).

¶35. Thus, based on the above language, Nutra-Blend argues that Sunshine Mills cannot

recover consequential damages because if it had inspected the product, it would have realized it was the wrong product and prevented the damage. Nutra-Blend further relies upon the following comment on Section 75-2-715:

> Where the injury involved follows the use of goods without discovery of the defect causing the damage, the question of "proximate" cause turns on whether it was reasonable for the buyer to use the goods without such inspection as would have revealed the defects. If it was not reasonable for him to do so, or if he did in fact discover the defect prior to his use, the injury would not proximately result from the breach of warranty.

Miss. Code Ann. § 75-2-715(2)(a) cmt. 5 (West, Westlaw through 2025 Regular and First Extraordinary Sessions).

¶36. Nutra-Blend's argument is self-defeating; whether Sunshine Mills failed to inspect the product, and, if it did, whether that failure was the proximate cause of the damage, are factual determinations for the jury. *See* ***Smith v. Minier***, 380 So. 3d 889, 893 (¶ 13) (Miss. 2024) (Causation is an issue of fact that "is generally a matter for the jury." (internal quotation mark omitted) (quoting ***Rein v. Benchmark Constr. Co.***, 865 So. 2d 1134, 1143 (Miss. 2004))).

¶37. Nutra-Blend asserts that even a cursory inspection would have prevented the damage because it was "patent and obvious" that the product was not Vitamin D3 7500. In support of the assertion, Nutra-Blend emphasizes that: (1) Vitamin D3 500 was in different packaging than Vitamin D3 7500; Vitamin D3 500 is cream colored and Vitamin D3 7500 is brown; and Vitamin D3 500 is significantly more expensive than Vitamin D3 7500. Based on the above-described differences, Nutra-Blend assumes Sunshine Mills wholly failed to

19

inspect the product.

¶38.    Sunshine Mills, on the other hand, pointed out that it knew of only one Vitamin D3 product sold by Nutra-Blend, which Nutra-Blend had correctly sent many times in years prior.  It also emphasized that it receives thousands of different products and that suppliers frequently change product packaging. Sunshine Mills presented testimony that the product was inspected, per its policy.  Regardless, both parties presented conflicting testimony as to whether the product was inspected, and both parties introduced competent evidence for and against the reasonableness of Sunshine Mills' use of the product.  Whether Sunshine Mills inspected the product and whether its use of the product was reasonable plainly requires a fact-finder "to weigh conflicting evidence and inferences, and determine the credibility of witnesses[.]"  *Clark v. Ill. Cent. R.R.*, 794 So. 2d 191, 198 (¶ 19) (Miss. 2001).  It is not for the court to wade into the fact-finder's waters and make such determinations on summary judgment.

## CONCLUSION

¶39.    Because the Mississippi Products Liability Act does not bar Sunshine Mills' claims for breach of implied warranty and breach of contract, and because each claim involves genuine issues of material fact precluding summary judgment, we reverse and remand.

¶40.    **REVERSED AND REMANDED.**

**KING, P.J., MAXWELL, CHAMBERLIN, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.  RANDOLPH, C.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

20